Nos. 2013-1045, -1053

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____

JAN K. VODA, M.D.,

*Plaintiff-Cross Appellant,*

v.

MEDTRONIC, INC. and MEDTRONIC VASCULAR, INC.,

*Defendants-Appellant.*

_____

Appeals from the United States District Court for the Western District of Oklahoma in case no. 09-CV-0095, Senior Judge Tim Leonard.

_____

## BRIEF OF PLAINTIFF-CROSS APPELLANT
## JAN K. VODA, M.D.

_____

JOHN A. KENNEY
MCAFFEE & TAFT
Two Leadership Square 10th Floor
211 North Robinson
Oklahoma City, Oklahoma  73102
(405) 235-9621

MITCHELL G. STOCKWELL
D. CLAY HOLLOWAY
ALYSON L. WOOTEN
RICHARD W. GOLDSTUCKER
KILPATRICK TOWNSEND & STOCKTON
  LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia  30309
(404) 815-6500

*Attorneys for Plaintiff-Cross
Appellant Jan K. Voda, M.D.*

May 2, 2013

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Jan K. Voda, M.D. certifies the following:

1.  The full name of every party represented by us is:

    Jan K. Voda, M.D.

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

    Jan K. Voda, M.D.

3.  All parent corporations and any publicly held companies that own more 10 percent or more of the stock of the party represented by us are:

    None.

4.  The names of all law firms and the partners or associates that appear for the party now represented by me in the trial court or agency or are expected to appear in this court are:

    KILPATRICK TOWNSEND & STOCKTON LLP:  Mitchell G. Stockwell, D. Clay Holloway, Alyson L. Wooten, and Richard W. Goldstucker

    MCAFFEE & TAFT LLP:  John A. Kenney and Spencer F. Smith


/s/ Alyson L. Wooten
Alyson L. Wooten

*Attorneys for Plaintiff-Cross Appellant Jan K. Voda*

May 2, 2013

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................. i

TABLE OF AUTHORITIES ................................................................ v

TABLE OF ABBREVIATIONS ........................................................... xi

STATEMENT OF RELATED CASES ................................................. 1

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF THE CROSS-APPEAL ISSUE ............................... 1

STATEMENT OF FACTS ................................................................... 1

I.      Dr. Voda's Invention. ............................................................. 1

II.     Dr. Voda's Successful Invention Led to Copying and Infringement. ............. 2

III.    Medtronic's Willful Infringement. ......................................... 6

SUMMARY OF THE ARGUMENT ...................................................... 9

ARGUMENT ..................................................................................... 13

I.      Standard of Review ............................................................... 13

II.     Substantial Evidence Supports the Jury's Finding of Infringement. ............ 14

        A.      Substantial Evidence Demonstrated Direct Infringement. ................ 15

                1.      Substantial Evidence Showed Femoral EBU Use Necessarily Infringed. ............. 15

                2.      Substantial Evidence Independently Showed Specific Infringing EBU Uses. ............ 19

                        a.      Dr. Voda's EBU Infringement Testimony. ................. 19

                        b.      Dr. Chronos's Clinical EBU Use Testimony. ............... 23

                        c.      Dr. Chronos's Study Confirmed Actual Clinical Experience and, thus, Direct Infringement. ............ 25

       3.      The Circumstantial Evidence Supported Finding Direct Infringement............................................................................28

   B.    Substantial Evidence Demonstrated Inducement.................................32

       1.      Substantial Evidence Showed Medtronic Caused, Aided and Encouraged Infringement.....................................................33

       2.      Medtronic's Criticisms and Selected Evidentiary Focus Do Not Show the Required Absence of Sufficient Evidence.....................................................................................37

       3.      Substantial Evidence Showed Medtronic Specifically Induced Infringement..................................................................40

   C.    The Substantial Evidence of Contributory Infringement....................43

   D.    No New Trial Is Warranted As the District Court Did Not Abuse Its Discretion In Permitting Testimony on Cadaver Studies. .............................................................................................46

III.   The Jury's Damages Amount Is Proper and Supported. ...............................55

   A.    The Royalty Base Was Undisputed, and Proper. ................................55

   B.    The Jury's Verdict Was Supported by Substantial Evidence. ............56

IV.   The Jury Did Not Deliberate Prematurely and No New Trial Should Be Granted. ..................................................................................................63

   A.    Medtronic's Argument Is Waived.......................................................65

   B.    Medtronic Has Shown No Error..........................................................66

   C.    Medtronic Did Not Show More than Harmless Error.........................69

V.    Granting JMOL Over The Jury's Willfulness Finding Was Error...............70

   A.    The District Court Erred in Overriding the Jury's Findings. ..............70

   B.    None of the Reasons Identified Justified JMOL of No Willfulness............................................................................................72

1.    Medtronic's Infringement Defense Did Not Justify
      JMOL. .................................................................................... 72

2.    Medtronic's Retooled and Abandoned Invalidity Case
      Cannot Justify JMOL. ............................................................ 74

3.    Medtronic's "Own Patent" Defense Cannot Justify
      JMOL. .................................................................................... 76

CONCLUSION ...................................................................................... 77

CERTIFICATE OF SERVICE .............................................................. 79

CERTIFICATE OF COMPLIANCE ..................................................... 80

# TABLE OF AUTHORITIES

## Cases

*ACCO Brands, Inc. v. ABA Locks Mfr. Co.,*
    501 F.3d 1307 (Fed. Cir. 2007) ...................................................15

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.,*
    616 F.3d 1283 (Fed. Cir. 2010) ..................................................40

*Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.,*
    265 F.3d 1294 (Fed. Cir. 2001) ......................................... 42, 77

*Arris Grp., Inc. v. British Telecomms. PLC,*
    639 F.3d 1368 (Fed. Cir. 2011) ..................................................33

*Arthrocare Corp. v. Smith & Nephew, Inc.,*
    406 F.3d 1365 (Fed. Cir. 2005) ..................................................37

*AstraZeneca LP v. Apotex, Inc.,*
    633 F.3d 1042 (Fed. Cir. 2010) ..................................................39

*Bard Peripheral Vascular v. W.L. Gore & Asscs.,*
    682 F.3d 1003 (Fed. Cir. 2012),
    *cert. denied*, 133 S. Ct. 932 (2013)........................... 14, 70, 71, 74

*Benger Labs., Ltd. v. R.K. Laros Co.,*
    209 F. Supp. 639 (E.D. Pa. 1962) ,
    *aff'd*, 317 F.2d 455 (3rd Cir. 1963) ............................................23

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus.,*
    145 F.3d 1303 (Fed. Cir. 1998) ..................................................36

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.,*
    424 F.3d 1293 (Fed. Cir. 2005) ..................................................43

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993)....................................................................48

*Dodge v. Cotter Corp.,*
    328 F.3d 1212 (10th Cir. 2003) .................................... 47, 48, 49

*Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH,*
    524 F.3d 1254 (Fed. Cir. 2008) ............................................................ 73, 74

*Dynacore Holdings Corp. v. U.S. Philips Corp.,*
    363 F.3d 1263 (Fed. Cir. 2004) ....................................................56

*Energy Transp. Grp., Inc. v. William Demant Holding A/S,*
    697 F.3d 1342 (Fed. Cir. 2012) ....................................................55

*E-Pass Technologies, Inc. v. 3Com Corp.,*
    473 F.3d 1213 (Fed. Cir. 2007) ....................................................31

*Equal Emp't Opportunity Comm'n v. Heartway Corp.,*
    466 F.3d 1156 (10th Cir. 2006) ....................................................... 13, 15, 76

*Fuji Photo Film Co. v Jazz Photo Corp.,*
    394 F.3d 1368 (Fed. Cir. 2005) ....................................................59

*Global-Tech Appliances, Inc. v. SEB S.A.,*
    131 S. Ct. 2060 (2011)................................................................ 41, 72

*Goebel v. Denver & Rio Grande W. R.R. Co.,*
    215 F.3d 1083 (10th Cir. 2000) ............................................... 47, 49

*Guidance Endodontics, LLC v. Dentsply Intern. Inc.,*
    No. Civ 08–1101 JB/RLP, 2010 WL 4054115 (D.N.M. Aug. 26, 2010) .....57

*Head v. Lithonia Corp.,*
    881 F.2d 941 (10th Cir. 1989) ....................................................52

*Hoechst Celanese Corp. v. BP Chems. Ltd.,*
    78 F.3d 1575 (Fed. Cir. 1986) ....................................................74

*i4i Ltd. P'ship v.Microsoft Corp.,*
    598 F.3d 831 (Fed. Cir. 2010),
    *aff'd*, 131 S. Ct. 2238 (2011) ............................................... 16, 44

*iLor, LLC v. Google Inc.,*
    631 F.3d 1372 (Fed. Cir. 2011) ............................................ 73, 74

*In re Seagate LLC,*
    497 F.3d 1360 (Fed. Cir. 2007) ............................................ 70, 72

vi

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
    688 F.3d 1342 (Fed. Cir. 2012) ....................................................71

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999).............................................................. 49, 53

*Leader Techs., Inc. v. Facebook, Inc.*,
    678 F.3d 1300 (Fed. Cir. 2012) ...................................................21

*Leprino Foods Co. v. Factory Mut. Ins. Co.*,
    653 F.3d 1121 (10th Cir. 2011) ...................................................13

*Liquid Dynamics Corp. v. Vaughan Co.*,
    449 F.3d 1209 (Fed. Cir. 2006) ...................................................36

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) ........................................... passim

*Marbled Murrelet v. Babbitt*,
    83 F.3d 1060 (9th Cir.1996) ........................................................57

*Metabolite Labs. Inc. v. Lab. Corp. of Am.*,
    370 F.3d 1354 (Fed. Cir. 2004) ...................................................37

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005)............................................................. 39, 43

*Mirror Worlds, LLC v. Apple Inc.*,
    692 F.3d 1351 (Fed. Cir. 2012) ...................................................30

*Moleculon Research Corp. v. CBS, Inc.*,
    793 F.2d 1261 (Fed. Cir. 1986) ...................................................14

*Nanodetex Corp. Defiant Techs.*,
    349 F. App'x 312 (10th Cir. 2009)...............................................15

*Nickson Indus. v. Rol Mfg. Co.*,
    847 F.2d 795 (Fed. Cir. 1988) .....................................................56

*Osburn v. Anchor Labs., Inc.*,
    825 F.2d 908 (5th Cir. 1987) .......................................................52

*Powell v. Home Depot U.S.A., Inc.*,
   663 F.3d 1221 (Fed. Cir. 2011) ..................................................58

*Reeves v. Sanderson Plumbing Products, Inc.*,
   530 U.S. 133 (2000) ...................................................................57

*ResQnet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010) ...................................................61

*Ricoh Co. Ltd. v. Quanta Computer Inc.*,
   550 F.3d 1325 (Fed. Cir. 2008) ........................................... 39, 43

*Russo v. Ballard Med. Prods.*,
   550 F.3d 1004 (10th Cir. 2008) .................................................59

*Sims v. Great Am. Life Ins. Co.*,
   469 F.3d 870 (10th Cir. 2006) ...................................................69

*Smith v. Ford Motor Co.*,
   215 F.3d 713 (7th Cir. 2000) .....................................................50

*Spansion, Inc. v. Int'l Trade Comm'n*,
   629 F.3d 1331 (Fed. Cir. 2010),
   *cert. denied*, 132 S. Ct. 758 (2011) ...................................... 43, 74

*Stewart v. Adolph Coors Co.*,
   217 F.3d 1285 (10th Cir. 2000) .................................................14

*Stratoflex, Inc. v. Aeroquip Corp.*,
   713 F.2d 1530 (Fed. Cir. 1983) .................................................26

*Textile Productions, Inc., v. Mead Corp. and Fiber Trim Sewing Co.*,
   134 F.3d 1481 (Fed. Cir. 1988) .................................................23

*Toshiba Corp. v. Imation Corp.*,
   681 F.3d 1358 (Fed. Cir. 2012) .................................................42

*Toshiba v. Wistron Corp.*,
   270 F.R.D. 538 (C.D. Cal. 2010) ..............................................23

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*,
   699 F.3d 1340 (Fed. Cir. 2012) .................................................59

*Trell v. Marlee Electronics. Corp.*,
    912 F.2d 1443 (Fed. Cir. 1990) ..................................................62

*United States v. Bornfield*,
    145 F.3d 1123 (10th Cir. 1998) .................................................54

*United States v. Call*,
    129 F.3d 1402 (10th Cir. 1997) .................................................47

*United States v. Diaz*,
    597 F.3d 56 (1st Cir. 2010)........................................................68

*United States v. Evanston*,
    651 F.3d 1080 (9th Cir. 2011) ...................................................66

*United States v. Jadlowe*,
    628 F.3d 1 (1st Cir. 2010),
    *cert. denied*, 131 S. Ct. 1833 (2011)................................... passim

*United States v. Jones*,
    107 F.3d 1147 (6th Cir. 1997) ...................................................53

*United States v. Nichols*,
    169 F.3d 1255 (10th Cir. 1999) .................................................47

*United States v. Resko*,
    3 F.3d 684 (3d Cir. 1993) .........................................................67

*United States v. Roach*,
    582 F.3d 1192 (10th Cir. 2009) .................................................54

*Vita-Mix Corp. v. Basic Holding, Inc.*,
    581 F.3d 1317 (Fed. Cir. 2009) ....................................... 16, 17, 46

*Voda v. Cordis Corp.*,
    536 F.3d 1311 (Fed. Cir. 2008) ............................................. 1, 75

*Water Tech. Corp. v. Calco, Ltd.*,
    850 F.2d 660 (Fed. Cir. 1988) ...................................................42

*Webco Indus. v. Thermatool Corp.*,
    278 F.3d 1120 (10th Cir. 2002) .................................................15

## Statutes

28 U.S.C. § 1295(a)(1) ................................................................ 1, 49

28 U.S.C. § 1338(a) ........................................................................1

35 U.S.C. § 271(c) ........................................................................56

35 U.S.C. §§ 271(b) ......................................................................56

## Rules

Ariz. R. Civ. P. 39(f) ...................................................................67

Colo. R. Civ. P. Rule 47(a)(5) ......................................................66

Fed. R. Evid. 702 advisory committee's note ..............................49

Ind. R. Ct. 20(a)(8) ......................................................................66

N.D. R. Ct. 6.11(a) .......................................................................66

## Other Authorities

11 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice
and Procedure § 2883 (2d ed. 1995 & Supp. 2005) ......................................69

American Bar Association, Principles for Juries and Jury Trials 13(F), *available at*
http://www.abanet.org/juryprojectstandards/principles.pdf .........................66

Ninth Circuit Jury Trial Improvement Committee, Second Report:
Recommendations and Suggested Best Practices at 10-13 (2006) ...............66

## <u>TABLE OF ABBREVIATIONS</u>

| | |
|---|---|
| '213 patent | U.S. Patent No. 6,083,213 |
| A_____ | Indicated Appendix Page |
| Br. at ___ | Brief for Defendants-Appellants Medtronic Inc. and Medtronic Vascular, Inc. filed 3-11-2013 at page ___ |
| CLS | Scimed's CLS catheters |
| EBU | Medtonic's EBU catheters |
| JMOL | judgment as a matter of law |
| Medtronic | Defendant-Appellant Medtronic Inc. and Medtronic Vascular, Inc. |
| Voda | Plaintiff-Appellee-Cross Appellant Jan K. Voda |
| XB and XBC | Cordis's XB and XBC catheters |

## STATEMENT OF RELATED CASES

No appeal from this civil action was previously before this or any other appellate court known to directly affect, or be affected by, this Court's decision on appeal.  The '213 patent was previously before this Court in *Voda v. Cordis Corp.*, 536 F.3d 1311 (Fed. Cir. 2008).

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1338(a).  Voda timely filed his Notice of Cross-Appeal on October 25, 2012.  (A4013-A4016.)  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE CROSS-APPEAL ISSUE

Did the district court err in vacating the jury's willfulness verdict when it determined that *Seagate's* "objectively reasonable" requirement was not met?

## STATEMENT OF FACTS

### I.     Dr. Voda's Invention.

Dr. Voda began his medical training in Czechoslovakia, ultimately completing residency and fellowship cardiology programs in the U.S.  (A6685:11-A6688:17.)  He worked with Dr. Judkins, the inventor of the Judkins catheter and a pioneer in interventional cardiology (A6688:2-7), before entering private practice in Oklahoma.  While there, Dr. Voda directed the catheterization lab, had privileges at two Oklahoma City hospitals (A6688:10-11; A6688:25-A6689: 1, 8-

10), and performed over 6,000 angioplasties and a similar number of diagnostic procedures.  (A6690:9-10.)

Dr. Voda discovered that, in angioplasty, the "catheter has to be stable and be able to keep its position in the left coronary artery despite that we have to generate tremendous pressure."  (A6701:2-5.)  Because of the forces at play, pushing the catheter tip across a blockage in the artery created "pushback forces" that would dislodge the guide catheter.  (A6709:1-24.)  These pushback forces made use of existing catheters difficult.  (A6709:25-A6710:12.)  Prior, Judkins-type catheters engaged the aortic wall at a point above the left main coronary artery, as illustrated here.  (A13042; A6715:14-22.)  That support was insufficient to combat the significant pushback forces that dislodged the catheter from the proper position.  (A6711:12-13; A6865:13-17.)  As a result, Dr. Voda created his invention.



## II.    Dr. Voda's Successful Invention Led to Copying and Infringement.

After designing a new shape that provided a large area of support to counter the pushback forces, Dr. Voda contacted SciMed, USCI and Schneider, among others, for assistance in commercializing his invention.  (A6803:20-24.)  SciMed, now Boston Scientific, assisted Dr. Voda by creating a prototype used to test for

efficacy and safety.  (A6733:12-20.)  Scimed eventually licensed Dr. Voda's catheter invention for a 7% royalty (A6735:12-14; A7123:5-7; A6809:21-23), and began selling the licensed Voda line of catheters.  (A6741:9-12; A6809:15-20.)  The Voda catheter's success took SciMed's catheter business from a "sort of up-and-coming company"



(A6331:25-A6332:24) to a leader in the guide catheter market.  (A6353:20-A6354:13.)  Success was due to the large area of support the geometric design of the catheter created on the opposite aortic wall (A13042), which thus stabilized the catheter tip during procedures.  (A6733:22- A6735:11; A13165.)

Success caused every significant catheter company to copy Dr. Voda's invention.  (A6796:24-A6797:15.)  Medtronic admitted its competitors copied shapes embodied Dr. Voda's inventive method.  Cordis introduced the XB (Xtra-Backup) line of catheters (A6410:14-A6411:7; A6425:18-A6426:20; A6606:11-A6607:7) and Abbott introduced a backup catheter that copied Voda's shape.  (A6411:8-A6425:17; A6426:17-20; A6437:4-15.)  Dr. Voda enforced his rights against both—this Court affirmed Cordis infringed and Abbott, a small player that later exited the market, settled.  (A7236:12-18; A7184:13-A7185:1.)

Medtronic also copied Dr. Voda's invention, introducing the EBU (Extra-Backup) catheter.  (A6386:6-11; A6382:24-A6385:2.)  Medtronic's designers knew of Dr. Voda's catheter and patent disclosures.  (A6575:13-A6577:24.)  By using the Voda patent descriptions that admittedly "taught" the Medtronic designers about backup support (*id.*; A6386:19-24), Medtronic leapfrogged from its previous, "inferior" Durfee curve to the infringing EBU.  (*Compare* A13000 (top) *with* A10293 (bottom).)  Medtronic had no evidence of shape development between the Durfee curve and the infringing EBU.  (A6573:1-24; A6568:14-A6572:25.)  To the contrary, Medtronic had determined the Durfee curve was inferior (A6506:19-A6507:6) and had received requests from doctors to mirror Dr. Voda's catheter shape because of its success.  (A6503:1-19.)



Medtronic marks its EBU promotional literature with the "Brin patent" Medtronic received for the EBU shape. (A10298; A6412:12-A6413:1.) By cross-referencing the Brin patent Medtronic's quality control documents that aimed to ensure its specially-engineered shape always appears in its final product (A6380:18-A6385:2; A13038; A13039), the evidence confirmed that 12-12.5cm of the EBU was in "intimate contact" with the opposite aortic wall. (A6590:12-A6594:11.) At trial Mr. Horrigan, an inventor on the Brin patent and Medtronic's EBU designer, color-correlated Medtronic's quality control template (top) to the Brin patent's Fig. 1 and other disclosure. (A6387:18-A6401:19.) The pink section is the "first arcuate portion 12" having a "length of approximately 10cm" and is "disposed along the contralateral wall of the ascending aorta," as both the Brin patent (A10287(2:17-29)) and Mr. Horrigan



FIG. 1

5

confirmed.  (A6390:18-A6392:20; A13041; A13172.)  He also confirmed that about 2 to 2.5cm of the orange section, from the apex to the start of the first arcuate portion, contacted the opposing aortic wall.  (A6409:1-A6410:13; A6400:23-A6401:7.)  Both the 10cm pink section and the 2-2.5cm orange section were in "intimate contact" with, and thus buttressed against, the contralateral wall. (A6592:17-A6594:11.)

That long contact length was intentional.  Both sides' witnesses agreed that curve design dictates the shape the curve will take inside the body.  (A6405:20-A6406:3; A6716:15-A6731:18; A6970:10-A6971:2.)  The EBU was purposefully engineered to provide extra-backup on the contralateral wall from a long length of engagement.  (A7054:10-A7055:15; A6384:6-24.)  As shown above, when used for its designed femoral approach, the EBU is designed to engage the opposite wall for 10-12cm -- far more than the 1.5cm engagement claimed.  (A7017:15-A7018:11; A7062:19-25; A10287(2:24-31).)

## III.    Medtronic's Willful Infringement.

Consistent with its design, Medtronic actively marketed EBUs as providing increased backup support from the contralateral wall.  (A6960:22-A6961:11;

> Broad Secondary Curve
>
> > Braces firmly against the contralateral aortic wall for superior backup support

A10298; A10293 (above).)  Device companies work with doctors in helping them adopt techniques (A6958:12-18) and sales representatives educated the doctors that

teach interventionalists-in-training how to do procedures requiring extra-backup. (A7257:2-A7260:14.)  Medtronic knew that providing literature with the physicial catheters would inform physicians how the catheter would perform in the body. (A7424:15-A7425:13.)  Medtronic used its materials to encourage use of Dr. Voda's method.  (A6964:24-A6968:10 (referencing A10298-A10299); A6968:25-A6970:9 (referencing A10292-A10297).)  Thus, Medtronic's literature and special-catheter design combined to induce and encourage trained physicians to engage the aortic wall greater than 1.5cm.  (A6958:21-25; A6962:20-23; A6936:2-A6964:3; A6964:9-23.)

Direct infringement was confirmed by testimony concerning actual EBU uses that resulted in greater than 1.5cm engagement.  (A6750:18-A6751:14; A6927:18-A6930:10; A6953:1-17; A6936:2-A6964:23.)  To confirm such use, Dr. Chronos replicated an intervention and physically measured visualized contact to confirm EBU engagement in prior *in vivo* uses, something not possible on living patients.  (A6974:19-A6977:10; A7387:25-A7388:12; A6980:14-A6981:7; A6975:1-A6979:18; A6986:14-A6987:13.)  Infringement was further confirmed in light of the necessity of performance given EBU's design and intended use for the femoral approach – the dominate approach in U.S. angioplasty.  (A7466:5-21; A6794:6-9; A6990:25-A6993:6.)

Despite the verdict in *Cordis* and being on notice that Voda believed Medtronic infringed (A13160), Medtronic never once tried to determine how much engagement took place. (A6428:10-19.) But, it knew more-than-sufficient engagement occurred for infringement. Medtronic specifically educates its sales force to promote the EBU as having a long length of engagement on the opposite wall. (A6638:6-15; A6419:7-14.) In addition to the materials to be given to doctors (A10292; A10298), Medtronic teaches the sales force that EBU creates more engagement on the contralateral wall than Cordis XB and XBC, such as through the presentation below. (A6421:9-A6424:5 (referencing A13069).)



Medtronic knew that Cordis catheters infringed (A7224:7-13 (A13249 (23:4-17)); (A13251 (38:24-39:18)) and tells its sales force that EBU engages even more than Cordis's catheters. (A6414:3-A6419:14 (referencing to A10323)). Medtronic's intent that infringement occur was clear given its shape, knowledge of performance, knowledge of what infringes, and encouragement of physicians to

use the catheter by buttressing long lengths against the opposite aortic wall.

(A6958:12-A6964:23.)

## SUMMARY OF THE ARGUMENT

1.      Admissions from Medtronic's witnesses and documents established
that the EBU necessarily engaged 10-12cm opposite the aortic wall.  These
admissions, coupled with evidence of distinct user groups for femoral and radial
approaches, established the EBU necessarily infringes.  Independently, Drs. Voda
and Chronos each testified concerning specific, pre-litigation uses of EBU
catheters whose design remain unchanged throughout its market life, and explained
how their training, as well as EBU design and Medtronic marketing materials,
allowed them to confirm the required engagement occurred *in vivo*.  This evidence,
coupled with Medtronic's admissions that (a) Cordis and Scimed catheters
embodied the '213 patented method and (b) that Medtronic's EBUs engaged even
more than such catheters, provided legally sufficient evidence of direct
infringement.

2.      Substantial evidence supported induced infringement where
Medtronic was shown to have copied the Voda catheter and patent disclosures to
create a catheter design having the same critical design segments for lengthy
engagement as Voda invented to achieve his claimed method.  Admissions from
Medtronic's designers, coupled with the teaching of Medtronic's Brin patent and

quality control documents, demonstrated Medtronic engineered its EBU to achieve far more than 1.5cm engagement. That specially-designed catheter was provided to physicians along with marketing statements that confirmed the broad secondary curve would, given its design, achieve the claimed engagement, even as its sales personnel were provided tools to promote its design that provided "even more" engagement than the Cordis XB cattheters Medtronic knew were found to infringe. Such marketing materials were routinely created by Medtronic for distribution to physicians, and, in fact, both sides' experts agreed that this was industry practice. Substantial evidence showed Medtronic's specific intent to induce given that Medtronic knew of Dr. Voda's patent rights, designed its EBU to achieve Dr. Voda's invention, knew that Cordis's XB had been found to infringe the '213 patent and that Medtronic designed its catheter to achieve more engagement than the infringing XB and licensed Scimed CLS curves, each of which admitted did practice the '213 patent.

3.    Substantial evidence supported contributory infringement where Dr. Voda established that radial and femoral users were distinct physician groups. Radial procedures were largely performed and accepted outside of the U.S., where the vast majority of physicians were instead trained and focused upon performing femoral procedures. Medtronic itself did not track any actual radial uses of EBU catheters, and the evidence showed only that radial uses for all types of catheters

10

within the overall U.S. angioplasty market was, at most, about 5% of the market. Given that the EBU was designed for femoral approaches and was marketed for such, substantial evidence supported the contributory infringement verdict.

4.    No new trial is warranted where the district court did not abuse its discretion in permitting testimony on Dr. Chronos's cadaveric study. The district court reviewed the studies, the arguments and testimony surrounding those studies, and correctly admitted that testimony under *Daubert*. The study confirmed and demonstrated Dr. Chronos's past experience with hundreds of EBU procedures and was performed using the same rigor he would approach an analysis outside of litigation. Dr. Chronos explained how physician training and use of catheters allowed a physician to feel when engagement occurred, and used his cadaveric study to take confirming measurements that supported his experience in using the EBU to achieve the required engagement.

5.    Substantial evidence supported the jury's award of $9.9 Million dollars on almost $70 Million in sales. The sales base was undisputed at trial and the award corresponded to a reasonable royalty within the range Voda presented, including Medtronic's maximum willingness to pay up to 18% given the demand for the technology and need to make EBU's sales. Cordis' payment of an effective 19.25% royalty that Dr. Wu presented confirmed that upper bound and Dr. Wu properly justified the damages award based on thorough analysis of all agreements,

11

as well as the other relevant factors.  The dispute on damages was properly
resolved by the jury on, at best, conflicting testimony.

6.    Medtronic waived any argument that the district court abused its
discretion in permitting the jury to discuss the evidence, but not deliberate.
Medtronic failed to inquire of the jury whether any deliberations occurred.  In any
event, the trial court's long-standing practice of managing this aspect of the jury
trial has been commended and recommended by numerous authorities and, on the
record here, the jury abided the court's instructions and did not prematurely
deliberate.

7.    Dr. Voda submitted sufficient evidence that Medtronic lacked an
objectively reasonable belief it could succeed in defending this action under
*Seagate*.  The evidence did not point but one way and the district court erred in
overriding the jury's verdict given the substantial evidence supporting its rejection
of Medtronic's infringement defenses.  Indeed, Medtronic's infringement defense
was not even a denial, but simply a demand that Dr. Voda submit proof of
infringement.  That "defense" immediately foundered on Medtronic's own
witnesses' admissions and its own documents, which showed the EBU necessarily
infringed.  The remaining record on infringement confirms that Medtronic's "prove
it" defense was not objectively reasonable.  Likewise, Medtronic's resubmission of
previously considered art and abandonment of validity at trial, demonstrates it had

12

no objectively reasonable validity defense.  Finally, the district court committed legal error in finding the existence of Medtronic's Brin patent could justify JMOL on the objective prong.  Medtronic itself did not rely on existence of its own patent to urge the objective prong was not met, and could not under the controlling law. Accordingly, JMOL on willfulness was unwarranted.

## ARGUMENT

### I.  Standard of Review.

Denial of JMOL is reviewed *de novo* and reversal is appropriate "only if the evidence points but one way and is susceptible to no reasonable inferences which may support" the verdict.  *Equal Emp't Opportunity Comm'n v. Heartway Corp*., 466 F.3d 1156, 1160 (10th Cir. 2006).  Medtronic thus must show "there is no legally sufficient evidentiary basis for a claim under the controlling law," with the "evidence and any inferences drawn therefrom" considered in Dr. Voda's favor. *Id*.

As to admission of expert evidence and the trial court's long-standing practice of allowing the jury to recall the evidence in their mind during trial, this Court reviews those issues for abuse of discretion and grants a new trial only if the alleged errors "affected the substantial rights of the parties."  *Leprino Foods Co. v. Factory Mut. Ins. Co.*, 653 F.3d 1121, 1131 (10th Cir. 2011).

Finally, under Tenth Circuit law, this Court reviews *de novo* the lower court's JMOL of no willful infringement. *Stewart v. Adolph Coors Co.*, 217 F.3d 1285, 1288 (10th Cir. 2000). In doing so, this Court must draw all reasonable inferences in favor of Dr. Voda and cannot make credibility determinations or re-weigh the evidence. *Id*. Whether the evidence satisfied the "objective" prong is a question of law. *Bard Peripheral Vascular v. W.L. Gore & Assocs.*, 682 F.3d 1003, 1006-07 (Fed. Cir. 2012), *cert. denied*, 133 S. Ct. 932 (2013).

## II.    Substantial Evidence Supports the Jury's Finding of Infringement.

Dr. Voda showed Medtronic induced and contributed to the infringement of his claimed method by direct and circumstantial evidence. Both forms are acceptable. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009); *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986). Sufficient evidence showed that physicians using the EBU obtained the required 1.5 cm *or greater* engagement on the opposing aorta wall. Dr. Voda then established that Medtronic actively encouraged infringement through the EBU's design, manufacture, promotion, and sales-force training, and that Medtronic contributed to infringement through its intentional design and promotion of EBUs having no substantial non-infringing use.

Medtronic's challenge to the jury's verdict ignores the evidence presented at trial detailed above and the reasonable inferences, drawn in Voda's favor, flowing

14

therefrom.  Medtronic's complaints do not justify JMOL.  *See Heartway*, 466 F.3d

at 1160-61.  At best, Medtronic presents a case of conflicting testimony and

challenges the persuasive value of legally permissible evidence.  Yet the jury's

verdict stands "even if different conclusions also might be supported by the

evidence," because "[i]t is the province of the jury, and not this court, to resolve

conflicts in the evidence."  *Webco Indus. v. Thermatool Corp.*, 278 F.3d 1120,

1128 (10th Cir. 2002) (internal quotations omitted).

A.    Substantial Evidence Demonstrated Direct Infringement.

Voda proved ***both*** specific uses of EBU catheters that infringed and that

femoral uses of the EBU necessarily would infringe.  Under controlling law, ***either***

suffices to support the jury verdict.  *See ACCO Brands, Inc. v. ABA Locks Mfr.

Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007).  Medtronic ignores the body of

evidence Voda presented, and the implicit jury findings, and improperly presents

this Court with its version of the cold record.  *See Nanodetex Corp. Defiant Techs.*,

349 F. App'x 312, 317 (10th Cir. 2009).

1.    Substantial Evidence Showed Femoral EBU Use Necessarily
Infringed.

The evidence showing the EBU necessarily infringes matched directly to the

"necessarily infringes" prong of *ACCO Brands* and related cases*,* a point

Medtronic seeks to ignore.  Even after *ACCO Brands*, this Court has issued

decisions rejecting Medtronic's logic.  Thus, in *i4i Ltd. P'ship v.Microsoft Corp.,*

15

598 F.3d 831, 850 (Fed. Cir. 2010), *aff'd*, 131 S. Ct. 2238 (2011), this Court found

that "[b]ased on the evidence presented at trial, a reasonable jury could have found

that at least one person performed the methods claimed…."  Despite conflicting

expert testimony, "the jury was free to disbelieve Microsoft's expert and credit

i4i's expert, who testified that the '449 patent was infringed if Word was used to

open an XML document, edit an XML document, or save a document containing

custom XML in an XML file format*." Id.*  Similarly, in *Vita-Mix Corp. v. Basic*

*Holding, Inc.,* 581 F.3d 1317, 1326 (Fed. Cir. 2009), this Court rejected

Medtronic's exact premise because appropriate inferences "establishe[d] that the

accused blenders will *necessarily* infringe **under certain circumstances**."  581

F.3d at 1326 (second emphasis added).  Acts of infringement had occurred because

certain uses necessarily infringed based on plaintiff's expert testimony.  *Id.*  ("It is

not too great an analytical leap for the jury to consider both experts' testimonies

and conclude that infringement actually occurs **in at least a small percentage of**

**customer use**." (emphasis added).)

The record shows both evidence of the specific "circumstances" of

infringement and that EBU use in those circumstances necessarily infringes.

As to the specific circumstances, there were two user groups for the EBU

catheter based on training and experience—femoral approach and radial/brachial.

The EBU specifically was designed for femoral.  (A7017:15-A7018:11; A7062:19-

25; A10287(2:24-31).)  Radial procedures in the U.S. were around 5% of the total

angioplasty market (A6991:7-A6993:6), and Medtronic did not even track EBU

radial usage.  (A7217:1-3.)

As to infringing use in the dominant femoral market, the key issue was the

amount of engagement during use, and the Brin patent,[1] Medtronic's quality

documents and its own witnesses (A6381:16-A6382:4; A13040-A13041;

A6382:15-23), established that far more than 1.5cm of the EBU engages the aorta

opposite the ostium.  *Supra* at 5-7.  Dr. Voda explained this as well (A6749:1-

A6759:12), and detailed how EBU's design necessitated engagement low in the

ascending aorta at a section directly opposite the ostium.  (A6759:17-A6762:9.)

And, he testified about the impact of EBU *in vivo* use and the resulting 10-12cm of

catheter engagement on the opposite wall.  (A6757:8-A6758:22.)  Thus, in the

femoral approach—the intended and designed use of the EBU—infringement

necessarily occurred.  *See Vita-Mix*, 581 F.3d at 1326.

---

[1] Medtronic submits unsupported attorney argument that the Brin patent is
somehow inapplicable to the EBU.  (Br. at n.4.)  Medtronic cannot avoid Mr.
Horrigan's admissions about the length of "intimate contact" and, thus,
engagement, or its own unequivocal branding of its marketing literature with the
Brin patent.  *Supra* at 5.  Mr. Horrigan admitted the EBU was designed to engage
the opposite wall for a length, not a point, as Medtronic had argued.  (A7053:23-
25; A7061:15-A7063:16 ("there was a length of engagement on the opposite wall
that would provide the backup support? A: Generally correct.").)

Medtronic complains that, even as to femoral approaches, Dr. Voda acknowledged that Medtronic's brochures showed a "borderline" infringement situation (A6891-25-A6892:15), an incorrectly-sized EBU catheter (A6893:4-12), and different Medtronic "MAC" and "Champ" catheters that were never accused or a Scimed Kiesz. (A6894:8-A6896:18.)   Dr. Voda explained, however, that the MAC depiction showed engagement and, similarly, that he had not used the Champ, but if told to assume it happened as depicted, it would infringe because the segment appeared deployed as required. (*Id*.) Medtronic then pointed out that Voda had admitted "Plaintiff does not assert that the Champ" infringes. (A6895:9-A6896:18). This was true – Plaintiff did not so assert because Dr. Voda had not used the Champ, the brochure had "information [that] is not accurate" in that it should have shown the segment in the coronary cusp and that catheters like both Champ and Kiesz did not have the required geometric configuration to contact the aorta wall. (A6894:8-A6896:18.)   Similarly, Medtronic complains that Drs. Voda and Chronos acknowledged radial use was accepted, and points to Mr. Horrigan and Dr. Uretski's testimony showing roughly six radial uses. (Br. at 29.) But, under *i4i* and *Vita-Mix, supra,* the jury remained free to conclude EBU use in the femoral approach that dominated 90% plus of the market and were the uses for which the vast majority of U.S. interventionalists were trained and which they preferred, necessarily infringed given EBU's intentional design that aimed for both

18

the required engagement and femoral use that eclipsed other uses.  (A6991:7-
A6993:6.)

>    2.    Substantial Evidence Independently Showed Specific Infringing
>          EBU Uses.

Medtronic insists pictures of *in vivo* EBU use were necessary to show direct

infringement.  (Br. at 30.)  This complaint, however, assumes a non-existent legal

standard and ignores the physician testimony that *in vivo* EBU use would, and in

fact did, achieve ***more than*** 1.5cm of contact of the wall opposite the ostium.

>    a.    Dr. Voda's EBU Infringement Testimony.

Dr. Voda explained why the EBU infringes when used.  Outside the body

the EBU has a similar shape to the inspirational Voda catheter (A6749:1-20), as

visual evidence before the jury confirms:



The patented Voda curve, left (A13001), and the EBU, right (A13041), reveal the

same catheter segments outside the body that yield similar *in vivo* performance.

Dr. Voda showed how EBU engages the contralateral wall for significantly more

than 1.5cm.  (A6749:21-6750:17; A6755:15-A6756:20 ("definitely you can never

get below, or close to 1.5[cm]. It will always be at least 5, 6 centimeters.").) And, Dr. Voda explained that, in the ten to twelve actual EBU catheterizations he performed, visualization of the catheter's behavior and its feel demonstrated well over 1.5cm of engagement. (A6750:18-6751:14.)

Dr. Voda's testimony, cross-examination of Medtronic's designers, the Brin patent and EBU quality control documents all confirmed that the catheter shape dictates its position and engagement inside the body and Medtronic's chosen design here results in 10-12cm of engagement. *See supra* at 5-6. Medtronic did not dispute Dr. Voda's point that EBUs achieved more engagement than the Voda curve and Cordis's XB shape (Br. at 31-32), as to each of which Medtronic admitted embodied the patented method. (A6425:4-A6427:7.) That is sufficient circumstantial evidence of direct infringement, especially when considered with other evidence. Dr. Voda testified he had used each of the CLS, XB and EBU catheters and all practiced claim 1, although the EBU engaged even more. (A6765:9-24; A6769:12-23; A6779:8-13.) Bill Kingston, a former Scimed employee and cardiac lab nurse, spent 2004-2007 as a circulator in a catheterization lab. (A6314:10-20; A6321:15-A6323:12.) The Voda curve, EBU, Cordis XB, and CLS were then "considered [] to be interchangeable." (A6323:22-A6324:15.) Thus, under fluoroscopy he "wouldn't know if I were looking at an EBU, or a CLS, or a Voda. They would all look very much the same to me."

20

(A6366:19-22.)  Taken alongside the proof that EBU engages more than the XB

and CLS curves that Medtronic admitted embodied the method claims, sufficient

evidence existed to find at least one EBU use infringed.

Medtronic instead argues Dr. Voda never precisely measured the amount of

contact.  (Br. at 32.)  But the claim requires only *1.5cm or greater engagement* and

Just as trained police officers can determine relative speeds, trained cardiologists

can determine *relative* lengths of engagement based on anatomy and knowledge of

how catheters perform.  (A6927:18-A6930:10.)  Dr. Voda's experience confirmed

the length that will engage the opposite wall "is definitely more than 1.5

centimeters."  (*Id*.)  Contrary to Medtronic's assertions (Br. at 31), Dr. Voda

explained in his uses of EBU

> [b]y injecting the contrast, if you inject a little bit more contrast, we
> can approximately see the size of the aortic root.  We know the
> dimension of the aortic root is about 3, to 3.2 centimeters.  ***When I
> used the EBU catheter, that fixed segment was at least the
> dimension of the aorta, it was actually much larger***.

(A6750:15-A6751:14 (emphasis added).)  Medtronic's attempt to contradict Voda

with his prior testimony clearly failed as Medtronic's citations indicate.  (*Compare*

Br. at 31 *with* A6934:24-A6935:10.)  This Court "cannot reweigh the evidence or

supplant the record," including by crediting what the jury found was ineffective

cross-examination.  *Leader Techs., Inc. v. Facebook, Inc.*, 678 F.3d 1300, 1308

(Fed. Cir. 2012).

Similarly, Medtronic claims Dr. Voda performed specific measurements in the prior Cordis litigation and failed to do so here. (Br. at 32.) This is, first, false. Dr. Voda did exactly what he described to the jury here: "put the dye in which has a very, very high contrast, then we can see differences between surrounding structures." (A2982:11-16.) The pictures Medtronic cites do not have measurements; rather, the determination of engagement length comes from experience with, and use of, catheters and knowledge of relevant anatomy. (A6750:15-A6751:14.) It is also irrelevant, as there is no claim requirement for such a specific measurement. Dr. Voda plainly explained his EBU use experience by analogizing that a book may be ten inches long, and a table significantly longer, and while you might not be able to tell if the table is forty or forty-two inches long, you definitely know its longer than ten inches. The jury was free to accept such observations in prior procedures established instances of EBU use where *greater* than 1.5cm of engagement occurred. (A6927:18-A6930:10.)

Medtronic also asserts that Voda's uses were before the '213 patent issued. (Br. at 31.) That is incorrect—the cited testimony is about when Voda may have received "instructions." (A6825:16-A6826:15 ("what I'm saying is that after 15 years, I have no recollection of anybody giving me specific information, but it doesn't mean that at the time nobody gave me specific instructions.").) In any event, the '213 patent claimed priority to October, 1992, and the EBU shape was

unchanged since first introduced. (A6380:14-17.) Thus, even if Voda's uses were before 2000, they still demonstrated use of EBU infringes.

Finally, Medtronic urges that Dr. Voda's EBU uses cannot show infringement because he cannot infringe his own patent. (Br. at 31.) But SciMed's exclusive license results in only SciMed catheters being authorized for use (A6807:23-A6808:3; A12196) and, thus, Dr. Voda's EBU use was unauthorized and infringing. *See Textile Productions, Inc., v. Mead Corp. and Fiber Trim Sewing Co*., 134 F.3d 1481, 1484 (Fed. Cir. 1988); *Toshiba v. Wistron Corp*., 270 F.R.D. 538, 542-43 (C.D. Cal. 2010); *Benger Labs., Ltd. v. R.K. Laros Co.*, 209 F. Supp. 639, 648 (E.D. Pa. 1962) , *aff'd*, 317 F.2d 455 (3rd Cir. 1963).

### b.    Dr. Chronos's Clinical EBU Use Testimony.

Dr. Chronos had impeccable and extensive credentials and experience fit directly to the issues he testified about. (A13376-A13411; A6941:23-A6947:21.) Before suit, he had performed interventions with EBU "[a] couple hundred times." (A6950:22-6951:3.) He explained why he was certain his hundreds of EBU procedures achieved greater than 1.5cm of aortic contact. Knowledge of such engagement begins with catheter selection (A6953:1-17) because, if an obstruction was likely to require more support, a catheter that provided extra-backup would be selected. (A7414:25-A7415:6.) The interventionalist would know to select a

curve such as EBU because of catheter companies' "encourage[ment] … to use these catheters." (A6958:12-18.)

Dr. Chronos then detailed what a trained interventionalist knows from the way catheter companies promote catheter use. (A6958:19-A6964:23.) Representatives provide literature such as A10298 along with physical samples. (A6958:21-25; A6962:20-23.) Noting Medtronic's own statements (A6960:22-A6961:11; A10298), Chronos explained how, from their experience, cardiologists can review a catheter and accompanying literature to determine which section will seat on the opposite aortic wall. (A6936:2-A6964:3.) Chronos showed the jury the sections of the catheter that sit in the ostium, span the aortic root, and rest on the contralateral wall (*id*.) explaining how interventionalists would know the EBU section engaging the opposite aortic wall is "clearly a lot more than 1.5 centimeters." (A6964:9-23.)

Medtronic reprises its argument challenging the timing of Dr. Chronos's procedures. (Br. at 33.) But Dr. Chronos performed interventions from 1993 to 2008 before proceeding to teaching and cath lab observations. (A7005:18-7006:25.) Thus, procedures he performed spanned the post-2000 issuance of the '213 patent, and included the same EBU whose design Medtronic witnesses confirmed had not changed since introduction. (A6380:14-17.)

c.    Dr. Chronos's Study Confirmed Actual Clinical
Experience and, thus, Direct Infringement.

Dr. Chronos's testimony was alone sufficient evidence to show direct
infringement, but he also conducted a confirming cadaveric study.  Both parties'
experts agreed that taking precise measurements of catheter engagement in a live,
human patient was impossible.  (A6974:19-6977:10; A7387:25-A7388:12;
A7431:15-24.)  Medtronic also conceded Voda did not need to be in every
catheterization lab to take measurements for every procedure, nor would that be
possible.  (A7430:13-23.)  Dr. Chronos's cadaveric study provided sufficient
evidence for the jury to conclude engagement, and direct infringement, occurred
with EBU use.  (A6984:14-17.)

The cadaveric study confirmed Dr. Chronos's and other physicians *in vivo*
EBU experience, in part, because of how closely it mimicked the actual event.
(A6980:14-A6981:7 ("I was very amazed how similar" the study compared to an
actual procedure.).)  That similarity was uncontroverted; Medtronic's expert
admitted he was not "trying to approximate the live patient situation and focus on
the details of the procedure."  (A7436:14-A7438:17.)  Angioplasty procedures are
an art mastered over years of intense training that imparts a sense of feel to the
trained interventionalist.  (A6979:20-A6980:13.)  Chronos explained how, after
setting up his cadaver study to mirror actual procedures, he could clearly discern
more than 1.5cm of engagement.  (A6975:1-A6979:18; A013375.)  A combination

25

of resistance felt on the catheter and visualization on the real-time fluoroscope enable interventionalists to discern more than 1.5cm engagement.  (A6978:12-A6979:18.)  Chronos testified, as Voda had, that "I am sure that the catheter is contacting the wall and going all the way around."  (*Id.*)

Medtronic urges that Dr. Chronos's cadaveric study could not confirm infringement because what interventionalists "feel" cannot evidence engagement.[2] (Br. at 33-34.)   To the contrary, Dr. Chronos's testimony detailed exactly how and why such feel via usage and visualization can be used to confirm engagement. Medtronic's real argument is that the evidence did not state engagement to decimal point accuracy.  (Br. at 34-35.)  But neither patent law, legal burden of proof, or the claims support Medtronic's critique, as sufficient evidence need only, and did show, that 1.5cm *or more* engagement occurred.

In any event, Dr. Chronos removed the heart from the water bath, with the EBU still inserted, and dissected off the roof of the aorta to measure the length of engagement.  (A6982:19-A6984:17.)  Without any force still asserted against the catheter, Chronos was able to measure 3.1cm of engagement—nearly double the claim requirement.  (*Id.*)  Chronos's simulations confirmed his experience and

---

[2]  Much of Medtronic's argument here and elsewhere about admissibility of Chronos's cadaveric study attacks the district court's orders, rather than the substantiality of evidence.  (Br. at 33-34, 58-59.)  But this is improper as this Court "review[s] judgments, not opinions."  *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1540 (Fed. Cir. 1983).

what Medtronic touted in its own literature:  significantly more engagement than prior art Judkins-style catheters and **at least twice** what Voda's claim requires. (A6986:14-A6987:13.)

Medtronic's final attack boils down to a complaint that the trial court should have accepted its evidence, rather than Dr. Voda's.  Medtronic points, first, to alleged "uncontradicted and unimpeached expert testimony" concerning Dr. Uretsky's measurements made in a similar cadaveric study.  (Br. at 35.)  Uretsky's testimony strongly undermines Medtronic's additional attack on Dr. Chronos's study, *infra*, and was vigorously contradicted and impeached.   Dr. Chronos explained how an operator could intentionally manipulate a catheter to perform in an abnormal and unintended way and how it looked to him Uretsky did so. (A6989:8-6990:18.)  Uretsky was accused of such manipulation, testifying as follows:

> Q.    You pulled back on the catheter once you had the tip in the ostium, didn't you, on the EBU?
> A.    I really don't remember, I just know that I had it in the left main.

(A7443:24-A7444:21.)

An accusation of manipulation followed by the expert saying "I really don't remember" is impeachment, and persuasive impeachment at that.  As for contradiction, if Medtronic is implying Chronos's study confirmed less than 1.5cm

engagement, that testimony was directly contradicted by Chronos and confirmed by Uretsky.  (A6977:18-A6979:18; A013375; A7439:22-A7441:3.)

Finally, Medtronic retools its *Daubert* challenge to suggest Chronos's study cannot support the verdict.  (Br. at 35-36.)  As shown below, this fails as a *Daubert* challenge and was not persuasive.  Medtronic's critiques were shown to be simply incorrect.  It says EBU measurements obtained from the window occurred after the catheter was removed and reinserted, but the evidence showed the catheter remained in the heart as it was transitioned to the table.  It posits a long list of "differences" between the cadaveric model and *in vivo* angioplasty.   But Dr. Chronos addressed these, for instance, explaining how the presence of a finger on the tissue flap would create less engagement, not more (A6984:18-A6985:1) and to show using water would impact engagement length in Dr. Chronos's study as compared to *in vivo* uses.  (A7436:7-10.)

The jury considered, yet rejected, Medtronic's attacks on Dr. Chronos's study that aimed "to back up my own clinical experience."  (A74, n. 5.)  Thus, his study's confirmation of his clinical experience represents sufficient evidence to show infringement.  (A6994:23-A6995:5.)

> 3.    The Circumstantial Evidence Supported Finding Direct Infringement.

Medtronic urges its marketing literature cannot be used to support the finding that interventionalists performed the infringing method because the

literature is not included in the packaging, Dr. Voda's acknowledged the literature alone did not show infringement and raises legal arguments that literature cannot show acts of infringement.  (Br. at 37-38.)  Each of these is incorrect.

Marketing literature (A10298-A10299; A10292-A10297; A10454-A10459) is given to physicians (A6958:19-6962:23; A6786:14-A6787:19; A6420:9-A6424:5) and is generally accompanied by a catheter because doctors "want to be able to play with it … they can't get that from a marketing brochure."  (A7255:17-21.)  Literature is thus reviewed with the physical catheter.  *See also* (A6781:14-24.)  The combination of such literature and catheter shape informs the trained user how much engagement occurs with use.  (A6963:2-6964:23 ("you know that this bit is the bit having gone around the artery of the aorta and being in the left coronary, this bit has to be up against the contralateral wall …. It's clearly a lot more than 1.5 centimeters."); A6785:4-A6787:19; A7073:5-9 (referencing A10298 as giving guidance to catheter's performance).)  The words 1.5cm do not need to appear for the trained physician to know the engineered shape will achieve the required orientation shown in the literature.

Medtronic nonetheless says that Voda's testimony that literature may show non-infringing uses does not mean Medtronic has rendered Voda's circumstantial evidence irrelevant.  (Br. at 37-38.)  In agreeing that some depictions of EBU appeared to show non-infringing uses of catheters, Voda confirmed that

measurements cannot be taken from the literature *alone*.  Instead, deducing

engagement length requires knowledge of the catheter shape and human

anatomy—precisely the knowledge the literature's audience possesses.  During the

questioning Medtronic cites Voda testified

> It looks kind of borderline.  Again, you asked me about did I measure
> this several times in the past.  I said I measured this indirectly.  By
> that what I mean, I measured the segment which I think is deployed
> along the wall of the aorta, and then I measured it against, or
> compared it with the dimension of the aorta.  I know the aorta of an
> average person is 3 to 3.2 centimeters; therefore, I can compare those
> two segments.  ***Although I don't measure it accurately, it gives me a
> reasonable assessment of the length of that segment***.

(A6891:25-A6892:14 (emphasis added).)  Medtronic's expert agreed "physicians

can take away from images like [A10298] kind of an understanding of what the

manufacturer believes the catheter is going to do in the body."  (A7424:15-

A7425:13.)  Sufficient evidence thus existed for the jury to conclude Medtronic's

brochures showed EBU's intended performance.

Medtronic urges that because promotional material did not contain exact

measurements and could appear to show non-infringing uses, the jury legally was

obligated to side with Medtronic.  (Br. at 38.)  But none of Medtronic's cases

support that proposition.  *Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1360

(Fed. Cir. 2012), held that manuals *by themselves* were insufficient to show direct

infringement when non-infringing uses were also shown.  But, here, the evidence

from experts in the field showed promotional materials, a catheter design intended

to engage as required and the intended audiences' skill, training and knowledge of patient anatomy that, collectively, confirmed EBU use would result in infringing engagement.  Similarly, *E-Pass Technologies, Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007), likewise cannot support Medtronic's point because the jury here expressly heard testimony tying the brochures, such as A10298, to the claimed steps.  (A6965:2-A6971:11.)

At heart, Medtronic essentially says its comparisons and boastings of significantly more engagement than catheters known to infringe cannot evidence direct infringement.  (Br. at 38.)  That is incorrect as a legal proposition, as circumstantial evidence counts as substantial supporting evidence.  But it is especially incorrect here, as it ignores the proven points that:  The intentionally-designed shape of the catheter dictates *in vivo* performance (A6405:20-A6406:3; A6716:15-A6731:18; A6970:10-A6971:2; A7068:16-21); Medtronic intentionally designed the EBU to provide extra-backup on the contralateral wall (A7054:10-A7055:17; A6384:6-24); and Medtronic's quality control ensures its designed shape always appears in its final product (A6380:18-A6385:2; A13038; A13039) and ensures proper *in vivo* performance.  (A7425:21-A7426:11.)

Further, and critically, after designing and making its infringing catheters to do the job of even more engagement, Medtronic acknowledged EBU had ***more engagement*** than catheters known to infringe.  Thus, Mr. Horrigan "agree[d] that

the EBU has more support on the contralateral wall opposite the ostium, this wall right here, than the XB" (A6412:2-6), and Medtronic promoted both the more direct engagement on the opposite wall (A6414:3-A6419:14 (referring to A10323), as well as comparisons like the below that "are supposed to be given to the customers and are," the purpose of which was to show "EBU has greater shaft in contact with the aorta" than the infringing XBC.  (A6420:9-A6424:5 (referring to A13069) (below).)



These materials and this evidence are part of the substantial, and more than sufficient, body of direct and circumstantial evidence showing EBU use engaged the contralateral wall more than 1.5cm.

**B.    Substantial Evidence Demonstrated Inducement.**

Medtronic's inducement position focuses on "instructions."  Yet inducement "includes acts that intentionally cause, urge, encourage, or aid another to directly infringe a patent." *Arris Grp., Inc. v. British Telecomms. PLC*, 639 F.3d 1368,

1379 n. 13 (Fed. Cir. 2011) (citation omitted)).  And, the jury instruction to which

Medtronic did not object required Dr. Voda to show Medtronic "knew of the patent

and ***encouraged or instructed*** another person to perform a process in a manner that

infringes the patent."  (A153 (emphasis added).)  This is precisely the standard

applied by this Court under 35 U.S.C. § 271(b) and sufficient evidence supports

the jury's inducement finding here.

> 1.    Substantial Evidence Showed Medtronic Caused, Aided and
>       Encouraged Infringement.

The EBU specifically was designed for femoral angioplasty of the left

coronary artery.  (A7054:10-A7055:17; A7062:19-A7063:16; A10286-A10291.)

That design included precision geometry to achieve a length of contact on the

opposite aortic wall from the left coronary artery well over 1.5cm and approaching

the 10-12cm mark.  (A7063:5-16; A6590:12-A6594:11; A6592:17-A6509:11;

A6380:18-A6385:2; A13038; A13039.)  These design actions, as well as the

manufacturing to ensure the shape performed as designed, were undertaken with

full knowledge of Dr. Voda's patent rights and invention.  They alone suffice to

show actions that caused, encouraged or aided infringement.

The jury rejected Medtronic's theory that there was no inducement because

physicians train on their own and Medtronic's sales force were focused on selling

other devices.  That rejection was reasonable given that (1) Medtronic trained its

sales force to emphasize the additional engagement provided by EBU's design and (2) provided the EBU with promotional materials emphasizing that point.

Interventionalists testified that device companies will work with the doctors in helping them adopt techniques. (A6958:12-18.) Sales representatives educated the doctors that teach budding practitioners procedures requiring extra-backup. (A7257:2-A7260:14.) The evidence showed not only how Medtronic's sales force "teaches the teachers" who instruct doctors on EBU use, but that initial sales training at Medtronic emphasized EBU's increased backup on the contralateral wall. (A7250:18-A7252:17; A13016 ("Broad secondary curve braces against the contralateral wall for superior backup.").) Medtronic sales force voicemails emphasized the more "direct route" the EBU took "from the support of the aortic wall" to the ostium, and forwarded clips showing longer engagement over Cordis's infringing catheters. (A6414:3-A6419:14 (referring to A10323).) Medtronic's sales force were thus trained to understand and promote the key feature of the EBU – that it "[e]ngages the ostium, but it bounces off the contralateral wall. That's what provides the backup support." (A7258:8-19.) And, Medtronic's trained sales force tells physicians that need more backup that Medtronic has "got just the thing, it's an EBU." (A7258:23-A7259:6.)

Coupled with the design of the EBU and the sales force that was educated to promote EBUs' longer engagement, were brochures aimed at showing trained

interventionalists what they could expect when using EBUs.  Medtronic creates these materials for its sales force to use with physicians and expects them to do so. (A6638:6-15; A6419:7-14.)  The literature depicts the EBU engagement on the contralateral wall while engaged in the left coronary artery, references the Brin patent, and boasts of increased engagement.  (A10298-A10299; A10292-A10297.) Interventionalists – who Medtronic points out are highly skilled and well-trained -- are presented with Medtronic's materials because "[t]hey encourage us, they help us, they give us ideas as to new techniques, and then we adopt them.  And they frequently will help us understand, encourage us how to use these catheters." (A6958:12-18.)

Medtronic critiques its materials as lacking specific lengths.  But testimony tied such promotional material directly to engaging per the claim.  (A6964:24-A6968:10 (referencing A10298-A10299); A6968:25- A6970:9 (referencing A10292-A10297).)   And, as discussed, the brochures were provided with the EBUs that allowed physicians to determine which segments would engage.  *Supra* at 29-30; *see also* (A6958:21-25; A6962:20-23.)

Medtronic says its voicemail was for sales personnel, not physicians.  But the reasonable inference from the widespread distribution of the voicemail ***and the forwarded clips*** showing greater-than-XB engagement comparison video is that Medtronic's sales force used, as ***admitted***, those materials to encourage physicians

35

to buttress EBUs 10-12cm segment against the opposite aorta wall. (A6420:9-A6424:5 (referring to A13069.)) That is especially so given the success the record showed Medtronic reps had in converting XB users. (A75.) And, that evidence must be considered with Medtronic's admission that Cordis XB and XBC embodied claim 1 (A6425:22-A6426:6) and the evidence that those catheters infringed. (A7224:7-13 (A13249 (23:4-17)); (A13251 (38:24-39:18).) At the same time, the evidence showed that the EBU sat lower in the aorta and thus created more coaxial engagement directly opposite the coronary ostium than XB or XBC. (A6423:18-A6424:5.) Medtronic says this was irrelevant (Br. at 42-43), yet the jury was permitted to find the engineered and known increased engagement of EBU over infringing Cordis catheters established that Medtronic's design, training and promotional materials encouraged skilled physicians to use EBUs for more than 1.5cm engagement.

This body of evidence is legally sufficient evidence of inducement. *See Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1222-23 (Fed. Cir. 2006) (evidence of intentional design to infringe and "examples" in manuals similar to those of patentee supported finding intent to induce); *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus.*, 145 F.3d 1303, 1311-12 (Fed. Cir. 1998) (intent to induce confirmed where advertisement of designed device encourages use covered by claim).

    2.    Medtronic's Criticisms and Selected Evidentiary Focus Do Not Show the Required Absence of Sufficient Evidence.

Medtronic's presentation is a critique of the trial court's JMOL decision with a focus on isolating and distinguishing each piece of evidence mentioned, while ignoring the overall record. Such a critique does not meet the governing standard, is ill-founded and is incorrect.

Medtronic's claim that there were no "instructions" to engage ignores the record. The jury was presented evidence that Instructions for Use, when combined with the "engineered-to-infringe" EBU, resulted in interventions being performed under the claimed method. (A6781:21-A6788:22 (referring to A10321-A10322).) Skilled physicians understood from promotional depictions that the EBU would engage, as designed, for more than 1.5cm. And, contrary to Medtronic's premise, the law does not require reciting "1.5cm or greater" in either instructions or brochures. *Metabolite Labs. Inc. v. Lab. Corp. of Am.*, 370 F.3d 1354, 1364-65 (Fed. Cir. 2004), for instance, upheld the verdict where plaintiff provided no direct evidence of a doctor performing a method step or explicit language directing a necessary correlation, but the jury reasonably inferred defendant's other materials evidenced both. *Id.* at 1364-65. *See also Arthrocare Corp. v. Smith & Nephew, Inc.*, 406 F.3d 1365, 1374-77 (Fed. Cir. 2005).

Similarly, Medtronic claims that none of its promotional materials count toward showing inducement, reprising its claim that "Voda conceded that some of

Medtronic's brochures" showed less than 1.5cm engagement.  (Br. at 43-44.)   But

Dr. Voda explained Medtronic's referenced Exhibit 69 – one of multiple brochures

in the record -- was "unreliable as far as manipulating the catheter" (A6890:12-17),

even while noting that "position two" therein was borderline and explaining why

that position depicted sufficient engagement.  (A6891:25-A6892:14.)  Medtronic

confuses what is necessary to show direct infringement – the combination of the

EBU design, promotions and experienced physicians testifying that use of such

resulted in engagement – with promotions showing Medtronic encouraged, caused

or aided such infringing use.  The physicians explained one cannot conclude

infringement exists from the brochure illustrations and take measurements

therefrom, but one can conclude infringing use is both encouraged and occurs

when considering those brochures with catheter's physical shape in light of

experience and training.  (A6781:14-A6787:19; A6960:4-A6963:20.)

Medtronic next juxtaposes the never-at-issue Champ and Kiesz curves next

to an EBU promotion to urge that, because Champ did not infringe and Scimed

paid no royalties on the Kiesz curves, the jury was bound to accept Medtronic's

argument that it had not induced.  But, as explained *supra* at 17-18, Voda

explained that he had not used Champ, and the admission was only that "Plaintiff

does not assert," infringement – a true statement as Voda had not used it, the

Champ seemed to perform like an Amplatz (A6895:2-23), and lacked the key

"tertiary curve" the EBU did have that ensured engagement.   (A6926:4-16.)

Medtronic tried the same tact with another curve called "Kiesz."  Voda explained,

again, that, like Champ, he lacked information to assess whether it would infringe

(A6899:20-A6900:5), but the Kiesz curve also "did not have this tertiary curve,

which enhances the ability of the segment to be deployed against the opposite wall

of the aorta."  (A6926:4-16.)

Medtronic's isolated focus on these different, distinguished and not-at-issue

catheters and a brochure that even then showed borderline infringement, cannot

overcome the other evidence that supports the verdict.  *AstraZeneca LP v. Apotex,*

*Inc.*, 633 F.3d 1042, 1059-60 (Fed. Cir. 2010), confirmed that existing non-

infringing uses do not erase liability because "active inducement may be found

'where evidence goes beyond a product's characteristics or the knowledge that it

may be put to infringing uses, and shows statements or actions directed to

promoting infringement.'"  *Id*. (quoting *Ricoh Co. Ltd. v. Quanta Computer Inc.*,

550 F.3d 1325, 1341 (Fed. Cir. 2008)); *see also Metro-Goldwyn-Mayer Studios*

*Inc. v. Grokster, Ltd*., 545 U.S. 913, 936 (2005).

Finally, Medtronic makes a novel legal and factual argument that neither

Voda nor Chronos were induced by Medtronic.  But this ignores the record

concerning the design and manufacture of the EBU, and evidence showing that

Medtronic's actions were geared toward inducing all of its customers to infringe.

Legally, *Lucent* rejected Medtronic's theory in upholding infringement where the expert was a Dell customer who had used the software he opined was infringing and then, briefly, explained how Microsoft's forms, tools, brochures and design encouraged such infringement.  580 F.3d at 1322-23.   Stronger, but certainly sufficient, evidence of Medtronic's inducement of its customers exists here.

> 3.    Substantial Evidence Showed Medtronic Specifically Induced Infringement.

Medtronic does not contest knowledge of the patent, and even the Cordis litigation.  (A74.)  Medtronic thus knew Scimed CLS products embodied the method, knew that Cordis's XB and XBC catheters infringed, knew the structural similarities between EBU and those catheters, yet boasted its design had more engagement.  *Supra* at 8, 20.  Medtronic critiques the district court's JMOL order and the verdict, claiming there was no evidence that CLS, XB-type and EBU products performed similarly.  This is incorrect; the evidence was that they were interchangeable and all practiced claim 1 (A6323:22-A6324:15; A6764:9-A6769:23) and such evidence directly supported the verdict.   *See Adams Respiratory Therapeutics, Inc. v. Perrigo Co*., 616 F.3d 1283, 1289 (Fed. Cir. 2010) ("when a commercial product meets all of the claim limitations, then a comparison to that product may support a finding of infringement.").

These facts with the evidence of inducement alone suffice to support the resolution of disputed facts concerning intent – an issue particularly within the

jury's province.  (A75.)  Independently, willful blindness was shown under any reasonable construction of the evidence.  That test asks whether Medtronic took "***deliberate actions to avoid*** confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts."  *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011) (emphasis added).  Medtronic claimed never once to have measured EBU catheter engagement via testing that would take little time and use its existing models (A6428:10-19), despite knowing Cordis XBCs infringed (A7224:7-13 (A13250 (36:15-37:19))), despite knowing comparisons of EBU and XBC showed more engagement and thus infringement (A6420:9-A6424:5) and despite a 2004 infringement notice. (A6798:1-15).  Of course, Medtronic already knew engagement exceeded 1.5cm, given the Brin patent established 10-12cm of engagement and its (EBU-to-XBC comparison. *Supra* at 5-6.

Indeed, EBU designers looked at Voda's patent disclosures and admitted to learning about how to obtain the desired amount of backup support.  (A6575:13-A6577:24; A6386:19-24; A7059:8-11.)  The Brin patent shows specific intent to design and obtain a shape that did the same thing as Voda's shape, as Dr. Voda detailed in comparing the EBU to his patent.  (A6749:1-A6751:14.)  Comparison of figures from the Voda and Brin patents confirmed Medtronic copied and designed EBUs to engage for more than 1.5cm, using the same components Dr.

Voda's patent described. (A6723:12-A6726:17 (referencing A13001 (Voda, left));

(A6387:18-A6401:19 (referencing A13172 (EBU, right)).)



Medtronic also argues that it lacked specific intent because EBU catheters

can be used in non-infringing radial uses and that Medtronic had its own patent on

the EBU's shape.  (Br. at 48-49.)  Medtronic is factually and legally wrong.

Legally, "[t]he existence of a substantial non-infringing use does not preclude a

finding of inducement."  *Toshiba Corp. v. Imation Corp*., 681 F.3d 1358, 1364

(Fed. Cir. 2012).  And, having one's own patent is neither an acceptable defense to

inducement (*Water Tech. Corp. v. Calco, Ltd.,* 850 F.2d 660, 668-69 (Fed. Cir.

1988)) nor serves as a defense to intent, as Medtronic well knows.  *See Advanced*

*Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1309 (Fed. Cir. 2001)

("that Medtronic's 556 patent might read on the Falcon catheter is totally irrelevant

to the question of whether Medtronic willfully infringed another patent.").

42

Factually, the Brin patent supported the finding of inducement and the jury was free to conclude, as demonstrated below, that any radial use was insubstantial.

C.    The Substantial Evidence of Contributory Infringement.

The incorrect premise behind Medtronic's argument is that proof of any non-infringing use forecloses contributory infringement.  But contributory infringement addresses "instances in which it may be presumed from distribution of an article in commerce that the distributor intended the article to be used to infringe another's patent, and so may justly be held liable for that infringement."  *Metro-Goldwyn-Mayer Studios*, 545 U.S. at 932; *see Ricoh*, 550 F.3d at 1338; *Lucent Techs.*, 580 F.3d at 1321 (quoting same).  Multiple cases thus confirm contributory infringement still exists even where there are non-infringing uses.

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1309-14 (Fed. Cir. 2005), reversed Medtronic's judgment of no contributory infringement, holding that "[d]rawing inferences in favor of [plaintiff], a reasonable juror might also conclude that ***in almost every surgery***, the claimed apparatus is made or used[.]"  *Id*. at 1314 (emphasis added).  *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1353-54 (Fed. Cir. 2010), *cert. denied*, 132 S. Ct. 758 (2011), found  respondents' evidence that some customers used a non-infringing mounting did not overcome petitioner's *prima facie* showing so as to meet the burden of production that had shifted to the respondents.  This Court has

43

also cited *Vita-Mix* in assessing the substantiality of potentially non-infringing uses, recognizing "the jury was allowed to consider not only the use's frequency, but also the use's practicality, the invention's intended purpose, and the intended market." *i4i*, 598 F.3d at 851.  Because the jury heard that the non-infringing use was not "a practical or worthwhile use for the XML community, for which the custom XML editor was designed and marketed," their verdict was sustained. *Id*.

Here, substantial evidence justified the jury's contributory infringement finding.  The ***intended*** purpose and market for the invention and EBU was the femoral approach (A7062:19-25; A6796:1-11), and the radial approach was virtually non-existent in the U.S. when Medtronic introduced EBUs.  Dr. Chronos presented a definitive study (A7217:6-A7218:2) showing it reached 1.32% in 2008 and does not now approach 5% of all U.S. procedures.  (A6990:25-A6993:6; A10547.)  Physician training and experience dictate preference for either femoral or radial approach, effectively creating a minority "radial" user-group and the dominate femoral user-group, which are aware of drawbacks to radial procedures. (A7017:15-A7018:7; A6794:10-A6795:14.)  Medtronic marketed the EBU for femoral while at the same time it had different catheters specifically designed for radial uses.  (A7275:19-A7276:11.)

The record thus showed infrequent EBU radial use, impractical for the vast majority of physicians who instead were trained for and focused on femoral uses.

Medtronic nonetheless cites Mr. Schmiel's testimony that EBU might be popular for radial use (Br. at 51), but here too the total number of radial procedures were less than 5% (A2714 (139:19-23)) and he confirmed radial procedures were a "niche" and "insubstantial" market. (*Id*. (139:24-141:22).) Medtronic presented no competent evidence of the prevalence of EBU's radial U.S. use. Indeed, Medtronic does not bother to track how many EBUs in the U.S. were used radially. (A7096:6-14.) But, as in *Spansion*, generic evidence did not meet Medtronic's burden of production. Indeed, given the above and Mr. Schmiel's unequivocal testimony the radial market was insubstantial, the jury reasonably found infringement.

Medtronic argues its witness-testimony that EBU is a "commodity" product and claims Voda admitted to the "substantiality" of non-infringing uses justifies JMOL. (Br. at 50.) This is neither what the record shows nor can overcome the substantial evidence identified above. Catheters may be commodity products compared to stents, but their specified shapes distinguish them amongst one another (A6403:4-12), as confirmed when Medtronic admitted it would lose sales without the EBU shape. (A7264:2-11.) And, Medtronic mischaracterizes Voda's testimony. All Dr. Voda said there was that the catheter "apparently is used" for radial and such uses would not infringe. (Br. at 50.) Dr. Voda then confirmed such use would be insubstantial, explaining the radial market was less than 2%,

radial EBU use would be a "clumsier procedure" because it was designed for

femoral approach and had characteristics unsuited to radial applications.

(A6795:6-A6796:11; A10287.)

Medtronic nonetheless relies on *Vita-Mix* to say that because radial

procedures are not "experimental" they represent substantial non-infringing use.

(Br. at 49.)  Such reliance is misplaced.  In *Vita-Mix*, the infringing use was not the

prevailing use it is here.  581 F.3d at 1326 (conditions only present "at least a small

percentage of the time" and infringement "actually occurs in at least a small

percentage of customer use.")  The *Vita-Mix* majority made clear that ***in that case***

the frequency of use "does not speak to the substantiality of the non-infringing

use," *id*. at 1327, in part because the dissent would have found contributory

infringement on that record.  *Id*. at 1355.  The record here shows the district court

correctly denied JMOL.

      D.    <u>No New Trial Is Warranted As the District Court Did Not Abuse Its<br>Discretion In Permitting Testimony on Cadaver Studies.</u>

Medtronic argues the district court's order is insufficient in denying its

*Daubert* motion and that the district court was wrong substantively.   (Br. at 52.)

Medtronic misapplies the standard and ignores the record.

That the district court was not verbose in denying Medtronic's challenge is

inconsequential.  The requirement on appeal is simply "'a sufficiently developed

record in order to allow a determination of whether the district court properly

applied the relevant law.'"  *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000) (quoting *United States v. Nichols*, 169 F.3d 1255, 1262 (10th Cir. 1999)).  The problem in *Dodge v. Cotter Corp.,* 328 F.3d 1212 (10th Cir. 2003), cited by Medtronic, and *Goebel* was that "[w]ithout specific findings or discussion on the record, it is impossible on appeal to determine whether the district court 'carefully and meticulously' reviewed the proffered scientific evidence or simply made an off-the-cuff decision to admit the expert testimony."  *Goebel*, 215 F.3d at 1088 (quoting *United States v. Call*, 129 F.3d 1402, 1405 (10th Cir. 1997)) (quotations omitted).

Medtronic misreads *Dodge* and *Goebel* to require that the district court make verbose "required findings" regarding *Daubert* motions.  (Br. at 52.)  Nothing in *Dodge* requires the court to detail its analysis and rationale for admitting evidence. In that case "[t]he important issue [was] the aggregate effect of several of the district court's decisions" on an issue central to that case involving challenged testimony with obvious issues.  *Dodge*, 328 F.3d at 1228.  Those several decisions resulted in (1) limited pages for *Daubert* briefing; (2) "exclusive use of argument and proffers"; (3) conducting only a cursory review of the contested issues at the hearing; and (4) lack of testimony from the experts themselves.  *Id*.  It was these decisions, "taken together,"  which "placed an unreasonable limitation on the

information available to the court and" thereby "exceeded the bounds of permissible choice in the circumstances." *Id*. at 1228-29.

Those circumstances are not here present. The entire case did not turn on the cadaver study, the district court did not limit the parties' briefing on Dr. Chronos' confirming study, and the parties filed the full record of reports and deposition testimony describing Drs. Chronos and Voda's challenged cadaver testimony. (A4017-4182.) In moving to exclude cadaver demonstrations, Medtronic did not distinguish between those of Voda or Chronos. But the district court did parse the record and testimony, ultimately excluding Voda's cadaver study after determining that "Voda's recollection of the 2005 demonstration is simply too imprecise and too vague to be useful to the jury." (A47-A48.) Conversely, the court found Dr. Chronos's study did not fit this category, and denied Medtronic's motion to exclude Chronos's demonstration because Medtronic's arguments go "to the weight of his testimony, not its admissibility of Rule 702." (A47.) This is precisely the analysis used by the Supreme Court in *Daubert* and Rule 702. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"); Fed. R. Evid. 702 advisory

48

committee's note ("[T]he rejection of expert testimony is the exception rather than the rule.") (2000 amendments).

The trial court's order reflects careful examination of the evidence (A45-A48), and stands in contrast to *Goebel* where nothing in the record "indicate[d] that the district court ever conducted any form of *Daubert* analysis whatsoever." *Goebel*, 215 F.3d at 1088.  Nothing here suggests the district court failed in its gatekeeper function.

Medtronic's substantive attack on Chronos's study does not show abuse of discretion.  The attack on reliability and fit ignores the record and misapplies the standard.

*Reliability*— "The plaintiff need not prove that the expert is undisputably correct or that the expert's theory is 'generally accepted' in the scientific community."  *Dodge*, 328 F.3d at 1222 (citation omitted).  The expert need only have shown scientifically sound conclusions and that the opinion satisfies the reliability requirements.  *Id*.  However the district court confirms reliability, the goal is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 1222-23 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)).

Medtronic ignores this standard as Dr. Chronos's study showed that appropriate rigor. (Br. at 56.) Chronos engaged in the same level of rigor based on past professional work and personal experience. (A6980:14-A6981:7.) Medtronic argues the relationship between performance in the cadaver study to live patients cannot come from the physician's tactile "feel," ignoring the undisputed testimony that angioplasty is a tactile art. *Supra* at 25. Chronos testified about how his research institute routinely uses cadavers to mimic human anatomy because it *is* human anatomy and such applicability makes logical sense. (A7040:12-A7041:4; A7030:12-A7032:7.)

Medtronic's criticism on peer review publications is likewise misplaced. The proper question is whether use of a cadaver to approximate human anatomy is accepted in the field. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 720 (7th Cir. 2000) (if an expert's "methodology is based on his extensive practical experience in this area, rather than novel methodology subject to publication, his failure to publish does not cast doubt on the reliability of his analytical technique."). The district court considered studies showing acceptance of cadavers in medical device testing. (A13244-A13246; A6975:1-9.) Medtronic cited its expert's own cadaveric study to show non-infringement, while still trying to claim unreliability, but that both experts used cadaveric studies only reinforce reproducibility and reliability here.

Medtronic argues that there was too high an error rate.  (Br. at 54-55.) Medtronic's argument ignores, again, the purpose of Chronos's study: To provide the jury with visual evidence of what Chronos knew from his hundreds of EBU procedures.  To show infringement, Chronos need only have been able to correlate his cadaver study to *one* of his actual EBU procedures.  *Lucent Techs.*, 580 F.3d at 1317.  Instead, Chronos explained the demonstration confirmed what he witnessed in his ***hundreds*** of procedures.  (A6980:14-A6981:7; A6994:20-A6995:5; A7015:1-20 ("The aim of it was to be representative of what I've experienced in my opinion, clinical training, and experience.").)

Medtronic presented no statistical argument, nor could it.  (A7445:23-A7446:1 (sustaining objection on statistical evidence when not disclosed in Rule 26 report).)  The district court properly rejected this statistical argument along with the rest of Medtronic's reliability challenges.

Finally, Medtronic cannot have it both ways.  Medtronic argues the study is wholly unreliable when it supports Voda's position, but argued extensively to the jury that its expert's similar study, done with less adhesion to the practices of the field, demonstrated no infringement.  It does so again to this Court.  (Br. at 35 ("The only testimony regarding actual measurement of any aortic contact ***within*** the cadaver heart was that of Medtronic's expert Dr. Uretsky. . . .").)  Thus, its complaint rings hollow.  *See Osburn v. Anchor Labs., Inc.*, 825 F.2d 908, 915-16

(5th Cir. 1987) (*cited by Head v. Lithonia Corp.*, 881 F.2d 941, 943 (10th Cir. 1989) (the "experts relied on essentially the same diagnostic methodologies; they simply drew the opposite conclusions from the available information….in which a jury must be allowed to make credibility determinations and weigh the conflicting evidence in order to decide the likely truth of a matter….")) (citations omitted).

*Fit*—Medtronic bases its "fit" attacks on possible, but unproven, differences, while ignoring established similarities.  (Br. at 56-59.)

Dr. Chronos testified that the catheter performed exceedingly similarly to how it had in hundreds of actual procedures, *supra* at 25.  Medtronic ignored other similarities, including: Uretsky's agreement the cadaver heart had similar shape to that of the anatomy of a live patient (A7435:20-23; A7436:2-6), as well as use of the same EBU catheter, via the same angioplasty process and same fluoroscopy equipment a physician would use in an actual procedure.  (A6975:17-19.)  Yet Medtronic insists Chronos's measurements do not adequately fit as the heart was not beating, there was unpressurized water, not blood, and not at body temperature. Medtronic offered no evidence as to how such differences could impact catheter engagement.  (A7432:15-18 (no studies showing difference in catheter interaction between live patient and cadaver); A7436:7-10 (no studies showing room temperature versus body temperature performance difference).)  And, when

Medtronic had Dr. Uretsky do his own cadaveric study, he did not consider those differences sufficiently problematic that he addressed them.

In fact, Uretsky acknowledged he was not paying attention to the catheter's performance. (A7437:14-A7438:9 ("You weren't paying attention to how it reacted as you were putting it in the body? Answer: No.").) Thus, the only record evidence of how the *catheter* would perform during both actual procedure and the cadaveric study came unrebutted from Dr. Chronos.

Medtronic insists that Chronos's measurements were made after the EBU was removed and were thus improper. (Br. at 57.) There is no evidence to suggest that the EBU was removed before the aorta was opened for visual inspection. Moreover, as discussed above, Chronos addressed Medtronic's assertion—if the support finger was applying pressure, the error favored *Medtronic* because it pushed the catheter away from the wall.

"[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho*, 526 U.S. at 156. Medtronic nonetheless says testimony about the "feel" of the flexible catheter engaging the aortic wall is insufficient. Yet, in this and other fields, experience is the predominant, if not sole, basis for reliable expert testimony. *See, e.g., United States v. Jones*, 107 F.3d 1147 (6th Cir. 1997) (no abuse in admitting handwriting examiner with years of practical experience and training who detailed his

53

methodology).  Just as a trained mechanic can "feel" the size of an unviewable bolt buried in an engine to estimate the correctly-sized nut or wrench to match, so Dr. Chronos's extensive experience in performing left main coronary catheterizations, and hundreds of EBU uses, allowed him to feel when the tip engaged the ostium and estimate the length of "broad secondary curve" that braced the contralateral wall.  He was free to testify about that experience, and to back that testimony with a study that demonstrated both the process of achieving the engagement and confirmation of the amount thereof.

*Prejudice*—Medtronic's final argument related to prejudice also fails.  The Tenth Circuit will not reverse a trial court's decision based on the erroneous admission of evidence if the error was harmless.  *See United States v. Roach,* 582 F.3d 1192, 1207 (10th Cir. 2009).  "An erroneous admission of evidence is harmless unless it had a substantial influence on the outcome or leaves one in grave doubt as to whether it had such effect." *United States v. Bornfield,* 145 F.3d 1123, 1131 (10th Cir. 1998) (quotation marks and citation omitted).

Any error in this case was harmless as the above factual record of infringement makes clear.  That is particularly true here where Chronos's corroborated his clinical experience with not only the cadaver study, but also the EBU design and promotional material.  Likewise, any prejudice argument fails as Medtronic's expert utilized the same method and study in performing the same test

Medtronic challenges.  No prejudice can be shown when an expert was simply ineffective and unpersuasive.

## III.    The Jury's Damages Amount Is Proper and Supported.

Medtronic urges the award of $9.9 Million is improper, attacking the undisputed royalty base and arguing against the evidence supporting the damages award.  Neither ground suffices.

### A.    The Royalty Base Was Undisputed, and Proper.

Medtronic waived any challenge to the royalty "base" when its expert affirmatively agreed to the base and Medtronic presented no different royalty base at trial.  (A7455:9-14 ("Talk about your first element, the royalty base.  Is that basically a known quantity?  A. Yes, yes, it is a known quantity.  I'm not aware of any dispute between the parties.  Dr. Wu and I seem to agree that the U.S. sales of the accused catheters for the time period that is at issue in this case would be $69,203,140.").)  *See Energy Transp. Grp., Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1357-58 (Fed. Cir. 2012) (defendant presented to jury, but not on to court on JMOL, a different base based upon non-infringement, and failure to present to district court waived the issue).  Here, Medtronic did not even present a different base to the jury.

Even assuming no waiver, Medtronic's claim that the royalty base included an unproven number of radial procedures is just speculation.  The jury did not

adopt the maximum damages of 18% of all EBU sales the evidence supported. (A7137:13-21.)  Critically, Medtronic cropped this Court's holding in *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1274 (Fed. Cir. 2004), by failing to quote the next sentence:  "Plaintiffs who identify an entire category of infringers (e.g., the defendant's customers) may cast their theories of vicarious liability more broadly, and may consequently seek damages or injunctions across the entire category."  (citation omitted).

Medtronic's "base" argument thus ignores what Voda proved:  Medtronic actively induces and contributes to the infringement of the '213 patent through its EBU sales to all of its customers.  Voda did this by showing that (a) EBUs necessarily infringe when performed in the intended and designed way and (b) EBUs are apparatus for practicing the patented process with no substantial non-infringing uses.  Under both 35 U.S.C. §§ 271(b) and 271(c), the "identified act" here was Medtronic inducing and contributing to its customers' infringement through sale of EBUs, and Voda was entitled to recover damages on all such EBU sales, especially when Medtronic never quantified EBU radial uses.  (A7096:6-9.) *See Nickson Indus. v. Rol Mfg. Co.*, 847 F.2d 795, 799 (Fed. Cir. 1988).

      B.     The Jury's Verdict Was Supported by Substantial Evidence.

The true thrust of Medtronic's complaint is to challenge Voda's expert, Dr. Wu's, methodology, as it improperly focuses solely upon proof presented through

Dr. Wu, rather than the record as a whole.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) ("[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record.").  Yet it made no *Daubert* motion, never objected to his methodology and never objected to the underlying evidence he relied upon.  But "the appropriate time to raise *Daubert* challenges is at trial" and failing to do so results in waiver, even when the argument is "couche[d] ... in terms of insufficiency of the evidence."  *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1067 (9th Cir.1996); *see also Guidance Endodontics, LLC v. Dentsply Intern. Inc.*, No. Civ 08–1101 JB/RLP, 2010 WL 4054115, *29 (D.N.M. Aug. 26, 2010).

The only proper question is thus whether the evidence whose competency was never challenged points but one way.  It does not.

Wu began his analysis with how Voda and Medtronic would come to the bargaining table in 2000.  (A7121:20-A7124:3.)  Wu determined the parties' financial bargaining range by, first, assessing Medtronic's maximum willingness to pay based on profit Medtronic would lose if it did not license so as to sell EBUs.  (A7124:4-19.)  Wu addressed the market, brand loyalty, and physician preference to determine that, if Medtronic did not license, it would lose 24% of EBU sales.  (A7128:13-A7133:16.)  This conservative estimate combined with the profitability of the EBU shape led Wu to conclude Medtronic would be willing to pay an 18%

royalty to ensure it could make such sales. (A7135:13-A7138:6.) To confirm Medtronic's maximum willingness to pay, Wu compared the $10.2 million Cordis paid for the right to make $53 million in sales, which resulted in a 19.25% royalty.[3] (A7138:7-A7139:6; A10473-A10484.)

Wu then determined that Voda's minimum willingness to accept would be 7% based, in part, on the exclusive license Voda gave to SciMed on unproven technology. (A7141:2-A7146:6; A10460-10472.) This too was conservative. When the SciMed agreement was reached, it was not clear Voda's invention would be successful (A6356:19-24), and Voda compromised from the 10% rate he was told to seek (A6803:1-13), partly because of a close relationship with Scimed's CEO. (A6809:24-6810:6.)

Wu also walked the jury through the relevant *Georgia-Pacific* factors to explain the impact of the relative bargaining strengths. (A7153:9-A7160:9.) The jury, however, found Voda's bargaining position was stronger and awarded an amount supported by the evidence. Such was their right, as both this Court and the Tenth Circuit have repeatedly confirmed. *See Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1241 (Fed. Cir. 2011) (finding "[t]he jury was entitled to choose a damages award within the amounts advocated by the opposing parties" and

---

[3] Medtronic offered no real dispute as to Wu's detailed analysis on this point – Becker merely said Wu's "math was wrong" concerning the 19.25% Cordis rate but never elaborated. (A7469:24-A7470:7.)

affirming a royalty rate higher than plaintiff's expert's minimum reasonable royalty); *accord Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.,* 699 F.3d 1340, 1358 (Fed. Cir. 2012); *Russo v. Ballard Med. Prods*., 550 F.3d 1004, 1018-19 (10th Cir. 2008); *Fuji Photo Film Co. v Jazz Photo Corp*., 394 F.3d 1368, 1378 (Fed. Cir. 2005).

Medtronic's damages complaints boil down to whether comparable licenses existed and were considered. (Br. at 60-63.) As noted, these are *Daubert*-type methodology challenges cloaked in a JMOL challenge. In any event, Wu's analysis was proper. Medtronic says the Cordis agreement was of "dubious probative value" because it was for two additional patents and was executed eight years after the hypothetical negotiation, and lodges similar critiques against the Scimed license. (Br. at 61-62.) But substantial evidence supports rejection of these arguments. Wu detailed how the number of patents were irrelevant to the rate, rather, the number of patents affected the base, which Wu drastically shrunk to account for absence of device patents. (A7149:13-A7151:14.) Medtronic's damages expert—Dr. Becker—did not rebut this. (A7502:4-A7503:25.) To the contrary, he agreed that his analysis "double-dipped" both by removing sales from the base and lowering the rate despite some of Voda's patents covering devices and the '213 patent covering a method practiced in the U.S. (A7304:1-10.)

Medtronic argues that the SciMed license was an exclusive worldwide license and included enforcement, sublicense, "and numerous other intellectual property rights." (Br. at 61-62.) Each was addressed and substantial evidence supported the jury's rejection of Medtronic's points.

*Exclusive Worldwide License*—The experts **agreed** the worldwide aspect of the SciMed license affected the base, **not** the rate as explained above. (A7503:13-25.) Wu further explained why the exclusive nature of the SciMed license would mean the hypothetical negotiation would result in a rate over 7%. (A7142:10-A7143:13.)

*Enforcement*—Medtronic says SciMed's right of first refusal to sue warranted a higher rate than anything it would agree to pay. The record does not support this. SciMed would keep the proceeds from any such suit and importantly placed no value on this because it freely gave that right back to Voda. (A6931:14-A6933:9; A7487:20-A7488:1; A7-8.)

*Sublicense*—Medtronic argued the right to sublicense in the SciMed license means the rate is not supported. But that right was for manufacturing needs and to foster the ability to sue by permitting settlement. (A7203:25-A7204:23.)

*Intellectual Property*—Medtronic says the 7% rate included other intellectual property Voda contributed to SciMed. But services and trademark use were separately compensated (services (A6806:16-A6807:21)) or were of no value

60

(A6359:8-20.)  Indeed, Becker's central premise was that the 7% was for copyrights and trade secrets (A7460:20-A7462:5), but cross-examination absolutely destroyed that premise.  (A7491:7-A7493:10.)

The cases cited by Medtronic (Br. at 62) do not support calling the SciMed license "radically different" given this detailed analysis to the hypothetical license under negotiation.  Medtronic's citation to *Lucent* is unavailing, because in contrast to this case:

> The testimony provides no analysis of those license agreements, other than, for example, noting the agreement was a cross-license of a large patent portfolio and the amount paid.  Lucent had the burden to prove that the licenses were sufficiently comparable…. [A] lump-sum damages award cannot stand solely on evidence which amounts to little more than a recitation of royalty numbers, one of which is arguably in the ballpark of the jury's award, particularly when it is doubtful that the technology of those license agreements is in any way similar to the technology being litigated here.

580 F.3d at 1329.  Ample evidence and analysis justified why the rate here was higher than the SciMed rate.  As to *ResQnet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870 (Fed. Cir. 2010), it found "none of these licenses even mentioned the patents in suit or showed any other discernible link to the claimed technology."  Here, the SciMed license covers the '213 patent and invention and the jury heard testimony of the '213 patent's importance to the rate.  (A7176:14-A7177:1.)

*Trell v. Marlee Electronics. Corp*., 912 F.2d 1443, 1447 (Fed. Cir. 1990),

does not show that, if exclusive, a license is not comparable.  The lower court used

the prior license as an ***established*** royalty rate, ignoring the license "conveyed

rights more broad in scope than those covered by" the patents; the claim at issue

went only to one component of the accused product; and the patented component

did not contribute to the profit of the accused product. *Id*. at 1446.  Here, the

evidence was the opposite given the analysis on base and that the shape creating

infringement differentiated the EBU from other lines and, thus, drove sales and

profits. (A7155:20-A7156:5.)

Other evidence than Cordis's ultimate 19.25% rate corroborated a royalty

rate considerably higher than the 7% rate in SciMed license and the 7.5% rate in

the Cordis verdict.  The SciMed rate was negotiated in 1991 and the Cordis verdict

had a hypothetical negotiation date of 1995.  By 2000, there was minimal risk in

Medtronic's adoption of proven, superior and in-demand technology, justifying a

significantly higher rate.  (A7121:20-7122:18; A7146:9-A7149:4; A13255.)  By

then, launching the EBU was risk-free because it was a known success (A7159:23-

A7160:2; A7219:7-21) and stents had fully entered the market, which hugely

increased demand for Voda's invention.  (A6810:7-A6812:11.)  Indeed, the "extra

backup" feature that drove demand for the "Extra-Back-Up" EBU directly used the

invention (A7258:8-A7259:6) and was required for Medtronic to not lose business

from lacking a competitive line of shapes. (A7263:15-A7264:11.) Wu further explained the timing of the Cordis agreement confirmed this realization of success and value to the '213 patent because it showed no substitutes existed. (A7155:20-A7156:15.)

Medtronic concludes by urging it would have sought a lump-sum royalty—even though neither it nor its expert ever proffered that theory. (Br. at 63.) Medtronic points to the "Durfee" license, but Durfee's curve was established as inferior (A6506:19-A6507:3 ("It wasn't gaining a lot of traction, it wasn't as good as Dr. Voda's curve….")) and so unsuccessful that the royalty cap was never approached. (A7196:2-A7197:1.) Likewise, Abbott's $1.1 million payment was for unknown sales (A7184:13-A7185:1), but were necessarily minimal because Abbott was proven to be an irrelevant market participant who altogether withdrew from the market. (A7236:12-18; A7267:12-25.)

The evidence detailed above supports the jury's verdict and, as the trial court correctly found, "[t]hat defendants presented contrary evidence does not entitle them to judgment as a matter of law as that evidence was not so overwhelming that it points but one way." (A81.)

## IV. The Jury Did Not Deliberate Prematurely and No New Trial Should Be Granted.

Medtronic urges error in the district court's permitting the jury to meet when witnesses were not on the stand to discuss, but not deliberate, the evidence. (Br. at

64-68.)  The court repeatedly instructed the jury that, when it met, it was not to

deliberate.  *See* (A86-88; A6672:7-20 ("…***but don't in any way begin to make any***

***comment or deliberate who should prevail, or not prevail***.") (emphasis added).)

The court gave that instruction anytime the jury met.  (*Id*; A7104:13-19;

A7284:13-19; A7497:5-16.)

Nothing about these instructions constitutes error.  To the contrary,

Medtronic has waived its challenge to this procedure, cannot show any legal error

in this well-accepted practice and, even if it could, cannot overcome the legal

presumptions and factual record supporting the harmlessness of any error.[4]  The

only Tenth Circuit authority Medtronic cites for proscribing this practice are model

jury instructions in ***criminal*** cases.  This is not a criminal case, rendering

Medtronic's claim of error insufficient to justify a new trial.  No one could argue

for a better type of civil proceeding for this practice than complex patent litigation.

Indeed, as shown below, the trial court used this practice for the exact reasons

multiple courts adopted that practice for civil trials and commentators have

endorsed it.  (A7325:12-A7328:25 ("I find that we tell them that they have got to

remember all of this, and I find that discussing matters is probably the best way of

recall from a memory standpoint, if they have discussed and talked about various

---

[4] Medtronic's citation to the court's slip of the tongue shows ***nothing***, especially considering that statement was made to counsel outside the presence of the jury. (A6457:18-20; A6459:20-23.)

evidence throughout the case, then they have a better recall at the end of the case."); A7549:8-A7550:15.)

A.    Medtronic's Argument Is Waived.

Medtronic waived its objection by not, as required, inquiring of the jury as to whether any premature deliberations had occurred.  The trial court made this plain, pointing out that Medtronic never "ask[ed] to query the jury either after the court received a note from the jury that defendants contend demonstrates the jury was deliberating or at the conclusion of trial."  (A88-89.)  Indeed, Medtronic released the jury after the verdict without question or objection even when prompted by the trial court (A7706:24-A7707:2,) and "[e]ven though this would have been the appropriate time to question the jurors if defendants truly believed any preliminary deliberations had occurred."  (A89 n. 30.)

Medtronic waived its objection by never seeking to develop the record as to whether the jury, as legally presumed, followed instructions.   Despite this, Medtronic seeks to continue to rely on *United States v. Jadlowe*, 628 F.3d 1 (1st Cir. 2010), *cert. denied*, 131 S. Ct. 1833 (2011).  But *Jadlowe* makes clear that an objecting party must enquire of the jury to determine if the court's instructions were being followed.  *Id*. at 21-22 ("such an inquiry could produce evidence that would advance the defendant's claim of prejudicial error," and would be

permissible under Fed. R. Evid. 606(b)).  It did not seek a jury inquiry and its

objection is thus waived.

B.     Medtronic Has Shown No Error.

The district court's practice is not barred.  Medtronic points to no authority

barring such practice in civil cases and such practice is endorsed by courts and the

American Bar Association.  *See United States v. Evanston*, 651 F.3d 1080, 1089

(9th Cir. 2011) (citing Ninth Circuit Jury Trial Improvement Committee, Second

Report: Recommendations and Suggested Best Practices at 10-13 (2006) ("(6)

permitting juror discussion of evidence as civil trials progress.")); Colo. R. Civ. P.

Rule 47(a)(5) ("jurors may discuss the evidence among themselves in the jury

room when all jurors are present."); Ind. R. Ct. 20(a)(8) ("jurors ... are permitted to

discuss the evidence among themselves in the jury room during recesses from trial

when all are present, as long as they reserve judgment about the outcome of the

case until deliberations commence"); N.D. R. Ct. 6.11(a); American Bar

Association, Principles for Juries and Jury Trials 13(F), *available at*

http://www.abanet.org/juryprojectstandards/principles.pdf at 20 ("Jurors in civil

cases may be instructed that they will be permitted to discuss the evidence among

themselves in the jury room during recesses from trial when all are present, as long

as they reserve judgment about the outcome of the case until deliberations

commence.").

66

Medtronic relies exclusively on criminal decisions. Yet the five enumerated reasons for why the court erred in admonishing the jury to not deliberate while permitting isolated periods to discuss evidence they have heard are limited to criminal proceedings. *United States v. Resko*, 3 F.3d 684, 688-89 (3d Cir. 1993) ("There are a number of reasons for this prohibition on premature deliberations in a ***criminal*** case.") (emphasis added). Even in analyzing the *Resko* rationale, the *Jadlowe* court emphasized the criminal versus civil distinction. 628 F.3d at 17-18. The *Jadlowe* court reasoned that:

> To be sure, not all of these reasons have force when the jurors are expressly told—as they are, for example, in Arizona—that they may discuss the evidence only in the presence of all jurors and that they must "reserve judgment about the outcome of the case until deliberations commence."

*Id.* at 18 (quoting Ariz. R. Civ. P. 39(f)).

This reasoning eviscerates Medtronic's complaints based on application of the *Resko* points. First, Medtronic is wrong that the jury was permitted to meet prior to hearing Medtronic's case. (Br. at 65.) As its second witness, Voda called Medtronic's corporate representative. (A6378:5-A6379:4.) Medtronic took the opportunity of having its representative on the stand to tell its entire non-infringement story. (A6520:23-A6521:9.) During Medtronic's direct of its witness on the first and second day, before the jury ever met, Medtronic presented its position on why the EBU did not necessarily infringe (A6490:10-A6492:23),

why it believed there were substantial non-infringing uses, why Medtronic did not

induce that infringement (A6561:21-A6364:2), and why Medtronic was not

willfully infringing (A6517:16-A6520:22).  The same is true for the fifth concern.

Before the jury ever met, Medtronic had presented at least as much of its case, if

not more, than Voda.  Thus, these concerns do not exist here.

Under *Jadlowe's* reasoning, Medtronic's second and third concerns do not

apply when the jury is instructed to not discuss merits or come to any conclusion.

628 F.3d at 18 ("Of course, not all premature jury discussion about a case will

compromise a defendants fair trial rights, particularly where the conversation does

not reflect a point of view about the evidence or the outcome.") (citing *United

States v. Diaz*, 597 F.3d 56, 63 (1st Cir. 2010)).  In fact, the trial court below

explained that such discussion on the evidence prevents dominate juror behavior

because their personality is more exposed to the collective instead of thrust upon

the jury during deliberation.

Medtronic glosses over the fourth concern because the jury in this case was

engaged and, as the trial court found, affirmatively demonstrated it was following

instructions.  Thus, even aside from the legal "presumption that 'jurors will remain

true to their oath and conscientiously follow the trial court's instructions,'" the trial

court correctly found that "in this case we have proof that the jurors did so."  (A88,

citing A6869:23-A6870:5 ("I don't know—I know we talked about if we all agree

on something that wasn't clear, we could ask a question, but we can't agree on that unless we meet ***because we're not supposed to discuss things***.") (emphasis added).)

C.    <u>Medtronic Did Not Show More than Harmless Error.</u>

Medtronic glosses over its burden to show the jury verdict was affected by the error, but "reversal is not appropriate unless the error prejudicially affected a substantial right of a party or if … the [error] led the jury to reach a contrary result." *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 886 (10th Cir. 2006).  An "important factor in determining whether an error was harmless is the strength of the case in support of the verdict…. The risk is greater that a particular error tipped the scales in a close case than" a one-sided case.  *Id*. (ellipsis original) (quoting 11 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 2883 (2d ed. 1995 & Supp. 2005)).

There is no evidence that discussing the evidence tipped the scales.  The jury did not meet until after Medtronic presented the evidence supporting its claims. When the jury did deliberate, they returned a specific verdict that included their own damages calculation.  That deliberation was "no more than five hours" is evidence this was not a close case and supports finding no prejudice. *Jadlowe*, 628 F.3d at 22.  Medtronic's failure to query the jury means the record shows no evidence, as in *Jadlowe*, whether preliminary deliberations took place that tipped

the scales.  *Id*. at 21-22.  To the contrary, Medtronic's argument that jury

adherence to its instructions "in no way proves that the jurors did not broach the

merits during their court-encouraged discussions" is contrary to the presumption,

and here actual evidence, that instructions were followed.  Based on its review, the

court in *Jadlowe **did not grant a new trial*** for that criminal proceeding.  *Id*.  In this

civil case, no new trial is likewise warranted.

**V.    Granting JMOL Over The Jury's Willfulness Finding Was Error.**

    A.    <u>The District Court Erred in Overriding the Jury's Findings.</u>

The district court determined Voda could not meet *Seagate*'s objective

prong that required evidence that Medtronic "acted despite an objectively high

likelihood that its actions constituted infringement of a valid patent."  *In re Seagate

LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).  (A79.)   Medtronic urged the

objective prong failed given its infringement defenses and invalidity assertions.

The district court accepted these reasons, added a third – Medtronic's possession of

the Brin patent – and granted Medtronic's JMOL request.  (A78-79.)

    *Bard*, of course, holds the objective prong is an issue of law based on mixed

questions of law and fact (682 F.3d at 1006-07), while the subjective prong

remains a factual issue for the jury.  But, in reaching this conclusion, *Bard* took

pains to note that "when the defense is a question of fact or a mixed question of

law and fact," the judge may "allow the jury to determine the underlying facts in

the first instance," albeit while reserving the ultimate legal question on the

objective prong. *Id*. at 1008. Where other mixed questions of fact and law are so

resolved, the proper course is to "presume that the jury resolved the underlying

factual disputes in favor of the verdict [ ] and leave those presumed findings

undisturbed if they are supported by substantial evidence," and thereafter review

the legal conclusion "*de novo* to see whether it is correct in light of the presumed

jury fact findings." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d

1342, 1356-57 (Fed. Cir. 2012) (citation omitted).

This same approach holds true after *Bard*. In crediting Medtronic's

infringement defenses and claim of having its own patent, the district court gave no

consideration or respect to the jury's verdict that presumptively rejected the

reasonableness of that defense under the objective prong. (A166.) This was error,

but the error was compounded by the nature of these defenses, which turned

around issues of proof and intent. The proof issues—whether the EBU sufficiently

engaged or whether substantial non-infringing uses existed—were resolved by the

jury on the record detailed above and substantial evidence supports both the

underlying liability determination and that Medtronic's denial of these points was

objectively unreasonable. *Kinetic Concepts,* 688 F.3d at 1356-57 (leaving factual

findings of jury in place in review of mixed question issues). The intent aspects of

the infringement defense—whether Medtronic intended infringement to occur—are

71

irrelevant to the objective prong as that is part of the subjective analysis, which is

for the jury alone. *Seagate*, 497 F.3d at 1371; *see also Global-Tech Appliances,*

*Inc.*, 131 S. Ct. at 2068-69. Similarly, Medtronic's claim that it had its own patent

could only be an "intent" issue given hornbook law that such is no defense to

infringement, inducement or willfulness. Thus, the trial court erred in concluding

Medtronic's presentation of defense on these two issues could support JMOL.

    B.    <u>None of the Reasons Identified Justified JMOL of No Willfulness.</u>

Even setting aside the error in ignoring the jury's findings, the district court

erred in its ultimate legal conclusion as well. Medtronic never denied direct

infringement, instead it claimed not to know. (A6428:10-A6429:8; A7353:21-

A7354:19; A7426:12-16 ("You actually have no opinion about how much the EBU

– how much engagement the EBU has on the opposite wall of the aorta? A. Right.

I don't know the answer to that question.").) Similarly, Medtronic presented ***no***

invalidity defense at trial. (A78, n. 14.) Medtronic also argued that its own patent

showed it believed it was not infringing, despite its legal irrelevance to that point.

Thus, each of the defenses were insufficient to justify JMOL.

    1.    Medtronic's Infringement Defense Did Not Justify JMOL.

While Medtronic's ***state of mind*** is not relevant under the objective prong,

what it ***knew*** constitutes facts upon which the objectively defined risk must be

weighed. *See Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1264 (Fed. Cir. 2008); *see also i4i*, 598 F.3d at 860.

The catheter industry knew, and Medtronic took pleasure from knowing, Cordis's XB, XBC, and CLS catheters infringed the '213 patent. (A6425:4-A6427:7.) Thus, what makes JMOL even more suspect here is the evidence that, objectively, Medtronic could not expect success given it knew that Cordis was shown to infringe, as affirmed by this Court, and that Cordis had also failed in challenging validity using grounds Medtronic simply revamped. (A7224:7-13 (A13249 (23:4-17)); (A13251 (38:24-39:18))) That Medtronic knew of these facts was undisputed – it monitored the Cordis case (*id.*) and felt schadenfreude when Cordis lost (A7224:7-13 (A13250 (36:15-37:19))).

Indeed, Medtronic knew its catheter resulted in significantly more engagement on the contra-lateral wall and positioned more directly opposite the ostium the aorta than infringing Cordis or licensed Scimed catheters. (A6412:2-6; A6423:18-A6424:5.) Medtronic's patent confirmed EBU has 10-12cm in "intimate contact" with the opposite aortic wall. (A6590:12-A6594:11.)

Under these circumstances, Medtronic knew facts showing there was an objectively high risk of infringement and the district court erred in concluding otherwise. *See iLor, LLC v. Google Inc.*, 631 F.3d 1372, 1378 (Fed. Cir. 2011). And, to the extent Medtronic's intent remained relevant under the objective prong,

the evidence of intentional copying and promotion showed intent to induce and contribute to infringement. *Supra,* at 32-46. For contributory infringement, Medtronic knew it had not tracked supposed EBU radial procedures and thus could not rebut Voda's *prima facie* showing. *See Spansion*, 629 F.3d at 1353.

It was thus improper to conclude a reasonable litigant could have expected to prevail on this record. *Bard Peripheral Vascular*, 682 F.3d at 1008; *see also iLor*, 631 F.3d at 1378. Indeed, this case is a far cry from *Bard* and *iLor*, where the district court's determination of reasonable defense stemmed from close decisions on claim construction. Here Medtronic simply put Voda to his proof.

2. Medtronic's Retooled and Abandoned Invalidity Case Cannot Justify JMOL.

As noted, Medtronic's invalidity assertions were retooled versions of Cordis's failed claims, and Medtronic knew that it had no objective basis for concluding the patent was invalid. But, there were additional record facts confirming that JMOL was unwarranted based on Medtronic's validity defense: Medtronic's failed reexamination efforts and its abandoning invalidity at trial.

*Reexamination*—The district court erred in simply looking at the fact reexaminations were filed and not substantively evaluating the merits of those reexaminations. *See Dominant*, 524 F.3d at 1261. The fact reexaminations were sought does not create objectively reasonable behavior, *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1584 (Fed. Cir. 1986), especially reexaminations

74

filed after suit, based on art already considered by the PTO, a prior district court, and this Court, and which resulted in confirmation.

Medtronic's first reexamination was made up of art that was not new and the claims were ***confirmed***.  (A13203-A13204 (submitting "Bower," "Sylvanowicz," the "USCI" article, and "Rizzo" for reexamination); A178 ('213 patent listing "Bower," the "Sylvanowicz" parent, the "USCI" article, and the "Arani" paper describing the same catheter in "Rizzo"); *Voda*, 536 F.3d 1311, 1323 (Fed. Cir. 2008) (confirming validity in light of Judkins-shaped catheters, described in Bower, Sylvanowicz, and USCI); A13175-A13179 (jury verdict of no invalidity over "USCI" article showing all the catheters at issue); A13361-A13362.) Medtronic merely presented previously rejected validity arguments – but those were not reasonable bases for objectively concluding the patent was invalid.

Medtronic's subsequent failed reexaminations are of the same character. The second reexamination was denied – it included only references listed on the patent's face which Medtronic never presented in the litigation.  (A13194.)  The third was on the exact art presented in the first reexamination and the PTO found "[o]ne of ordinary skill in the art could not reasonably determine, with any certainty, the length of contact of the Arani catheter from the figures in Rizzo et al or USCI"—claims ***confirmed***.  (A13182; A13368-A13370.)  This Court found the same issue faced art presented in the *Cordis* case. *Voda*, 536 F.3d at 1323-24.  The

fourth reexamination, based on art again cited on the face of the patent, was

summarily ***denied***.  (A13222.)  While Don Quixote would be proud, the district

court erred in finding this objectively reasonable given prior substantive results.

*Abandonment*— Medtronic recognized in part the futile nature of its defense

and voluntarily agreed to limit its invalidity case in litigation, though it later sought

to circumvent that agreement.  (A58-A60.)   As a result, Medtronic was limited to

only a handful of obvious combinations.  (A19-21.)  Moreover, there could be no

reasonable basis to press anticipation because Medtronic never asserted ***any*** prior

art references disclosing 1.5cm or greater engagement and the court summarily

adjudged that issue against Medtronic.  (*Id*.)

The remaining validity case was so weak, Medtronic abandoned it at trial

and Voda was granted JMOL on that issue.  (A78-79 (referencing A7546:22-

A7548:13); A7548:15-23.)  Medtronic's abandonment was an acknowledgement

that ***no reasonable jury*** could have relied on its evidence to find invalidity.

*Heartway Corp*., 466 F.3d at 1160.  The district court erred in finding this sort of

"validity" defense justified JMOL.

3.    Medtronic's "Own Patent" Defense Cannot Justify JMOL.

Even Medtronic did not claim that having its own patent justified JMOL on

the objective prong, but cited that point for justifying its "subjective" intent.

(A4201-A4205.)  That point had no place in assessing the objective prong, and

76

cannot justify JMOL. Indeed, crediting Medtronic's "own patent" defense was legal error because a "totally irrelevant" position cannot provide a sophisticated-litigant with an objectively reasonable belief of success. *Advanced Cardiovascular*, 265 F.3d at 1309.

*    *    *

The district court seemed to confuse the essential question – it was not whether Medtronic ***believed it had a reasonable defense*** – a subjective issue – or whether Medtronic presented only frivolous defenses. Rather, determining whether a reasonable litigant could believe in success must focus on whether the defenses were objectively reasonable given the underlying facts on which they were based. Considering the record and inferences in a light most favorable to Voda, the record is clear no reasonable litigant could have expected to succeed with Medtronic's defenses. Indeed, under this record, if Medtronic's defenses show no willfulness as a matter of law, willfulness doctrine is truly a dead letter.

## CONCLUSION

Voda respectfully asks this Court grant Voda's request to reverse the district court's order vacating the jury's willfulness verdict and deny Medtronic's requests

to reverse or vacate the infringement judgment, reverse the damages award, and

grant a new trial.

                                        Respectfully submitted,


                                        /s/ Alyson L. Wooten
                                        MITCHELL G. STOCKWELL
                                        D. CLAY HOLLOWAY
                                        ALYSON L. WOOTEN
                                        KILPATRICK TOWNSEND & STOCKTON
                                          LLP
                                        1100 Peachtree Street
                                        Suite 2800
                                        Atlanta, Georgia  30309
                                        (404) 815-6500

                                        *Attorneys for Plaintiff-Cross*
May 2, 2013                             *Appellant Jan K. Voda, M.D.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that I filed the foregoing document with the Clerk of the United

States Court of Appeals for the Federal Circuit via the CM/ECF system and served

a copy on counsel of record, this 2nd day of May, 2013, by the CM/ECF system

and electronic mail, addressed as follows:

Michael Simons
AKIN GUMP STRAUSS HAUER & FELD LLP
300 West 6th Street
Suite 1900
Austin, Texas 78701

Mark C. Fleming
Lauren B. Fletcher
Sarah B. Petty
Shirley X. Li Cantin
WILMER CUTLER PICKERING HALE AND DOOR LLP
60 State Street
Boston, Massachusetts 02109

/s/ Alyson L. Wooten
ALYSON L. WOOTEN
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street
Suite 2800
Atlanta, Georgia  30309

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rules of Appellate Procedure 28.1(e)(3) and

32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-

volume limitations of Federal Rules of Appellate Procedure 28.1(e)(2)(B)(i).

1.      Exclusive of the exempted portions of the brief, as provided in Federal

Rule of Appellate Procedure 32(a)(7)(B)(iii), this brief includes 16,490 words.

2.      This brief has been prepared in proportionally spaced typeface with

Microsoft Office Word in 14 point Times New Roman font, as permitted by

Federal Rule of Appellate Procedure 32(a)(5)(A).  In accordance with Federal Rule

of Appellate Procedure 32(a)(7)(C), the undersigned has relied upon the word

count of this word-processing system in preparing this certificate.

This 2nd day of May 2013.

<div style="margin-left: 40%;">

/s/ Alyson L. Wooten
ALYSON L. WOOTEN
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street
Suite 2800
Atlanta, Georgia  30309

</div>